(Slip Opinion) OCTOBER TERM, 2015 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## BANK MARKAZI, AKA CENTRAL BANK OF IRAN *v.* PETERSON ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 14–770. Argued January 13, 2016—Decided April 20, 2016

American nationals may seek money damages from state sponsors of terrorism in the courts of the United States. See 28 U. S. C. §1605A. Prevailing plaintiffs, however, often face practical and legal difficulties enforcing their judgments. To place beyond dispute the availability of certain assets for satisfaction of judgments rendered in terrorism cases against Iran, Congress enacted the Iran Threat Reduction and Syria Human Rights Act of 2012. As relevant here, the Act makes a designated set of assets available to satisfy the judgments underlying a consolidated enforcement proceeding which the statute identifies by the District Court's docket number. 22 U. S. C. §8772. Section 8772(a)(2) requires a court, before allowing execution against these assets, to determine, *inter alia,* "whether Iran holds equitable title to, or the beneficial interest in, the assets."

Respondents—more than 1,000 victims of Iran-sponsored acts of terrorism, their estate representatives, and surviving family members—rank within 16 discrete groups, each of which brought suit against Iran. To enforce judgments they obtained by default, the 16 groups moved for turnover of about $1.75 billion in bond assets held in a New York bank account—assets that, respondents alleged, were owned by Bank Markazi, the Central Bank of Iran. The turnover proceeding began in 2008. In 2012, the judgment holders updated their motions to include execution claims under §8772. Bank Markazi maintained that §8772 could not withstand inspection under the separation-of-powers doctrine, contending that Congress had usurped the judicial role by directing a particular result in the pending enforcement proceeding. The District Court disagreed, concluding that §8772 permissibly changed the law applicable in a pending litigation.

The Second Circuit affirmed.

*Held*: Section 8772 does not violate the separation of powers.  Pp. 12–24.

   (a) Article III of the Constitution establishes an independent Judiciary with the "province and duty . . . to say what the law is" in particular cases and controversies.  *Marbury* v. *Madison*, 1 Cranch 137, 177.  Necessarily, that endowment of authority blocks Congress from "requir[ing] federal courts to exercise the judicial power in a manner that Article III forbids."  *Plaut* v. *Spendthrift Farm, Inc.*, 514 U. S. 211, 218.  Although Article III bars Congress from telling a court how to apply pre-existing law to particular circumstances, *Robertson* v. *Seattle Audubon Soc.*, 503 U. S. 429, 438–439, Congress may amend a law and make the amended prescription retroactively applicable in pending cases, *Landgraf* v. *USI Film Products*, 511 U. S. 244, 267–268; *United States* v. *Schooner Peggy*, 1 Cranch 103, 110.  In *United States* v. *Klein*, 13 Wall. 128, 146, this Court enigmatically observed that Congress may not "prescribe rules of decision to the Judicial Department . . . in [pending] cases."  More recent decisions have clarified that *Klein* does not inhibit Congress from "amend[ing] applicable law."  *Robertson*, 503 U. S., at 441; *Plaut*, 514 U. S., at 218.  Section 8772 does just that: It requires a court to apply a new legal standard in a pending postjudgment enforcement proceeding.  No different result obtains because, as Bank Markazi argues, the outcome of applying §8772 to the facts in the proceeding below was a "foregone conclusio[n]."  Brief for Petitioner 47.  A statute does not impinge on judicial power when it directs courts to apply a new legal standard to undisputed facts.  See *Pope* v. *United States*, 323 U. S. 1, 11.  Pp. 12–19.

   (b) Nor is §8772 invalid because, as Bank Markazi further objects, it prescribes a rule for a single, pending case identified by caption and docket number.  The amended law upheld in *Robertson* also applied to cases identified in the statute by caption and docket number.  503 U. S., at 440.  Moreover, §8772 is not an instruction governing one case only: It facilitates execution of judgments in 16 suits.  While consolidated for administrative purposes at the execution stage, the judgment-execution claims were not independent of the original actions for damages and each retained its separate character.  In any event, the Bank's argument rests on the flawed assumption that legislation must be generally applicable.  See *Plaut*, 514 U. S., at 239, n. 9.  This Court and lower courts have upheld as a valid exercise of Congress' legislative power laws governing one or a very small number of specific subjects.  Pp. 19–21.

   (c) Adding weight to this decision, §8772 is an exercise of congressional authority regarding foreign affairs, a domain in which the con-

trolling role of the political branches is both necessary and proper. Measures taken by the political branches to control the disposition of foreign-state property, including blocking specific foreign-state assets or making them available for attachment, have never been rejected as invasions upon the Article III judicial power. Cf. *Dames & Moore* v. *Regan*, 453 U. S. 654, 674. Notably, before enactment of the Foreign Sovereign Immunities Act, the Executive regularly made case-specific determinations whether sovereign immunity should be recognized, and courts accepted those determinations as binding. See, *e.g., Republic of Austria* v. *Altmann*, 541 U. S. 677, 689–691. This practice, too, was never perceived as an encroachment on the federal courts' jurisdiction. *Dames & Moore*, 453 U. S., at 684–685. Pp. 21–23.

758 F. 3d 185, affirmed.

GINSBURG, J., delivered the opinion of the Court, in which KENNEDY, BREYER, ALITO, and KAGAN, JJ., joined, and in all but Part II–C of which THOMAS, J., joined. ROBERTS, C. J., filed a dissenting opinion, in which SOTOMAYOR, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 14–770

BANK MARKAZI, AKA THE CENTRAL BANK OF IRAN, PETITIONER *v.* DEBORAH PETERSON, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[April 20, 2016]

JUSTICE GINSBURG delivered the opinion of the Court.*

A provision of the Iran Threat Reduction and Syria Human Rights Act of 2012, 22 U. S. C. §8772, makes available for postjudgment execution a set of assets held at a New York bank for Bank Markazi, the Central Bank of Iran. The assets would partially satisfy judgments gained in separate actions by over 1,000 victims of terrorist acts sponsored by Iran. The judgments remain unpaid. Section 8772 is an unusual statute: It designates a particular set of assets and renders them available to satisfy the liability and damages judgments underlying a consolidated enforcement proceeding that the statute identifies by the District Court's docket number. The question raised by petitioner Bank Markazi: Does §8772 violate the separation of powers by purporting to change the law for, and directing a particular result in, a single pending case?

Section 8772, we hold, does not transgress constraints placed on Congress and the President by the Constitution. The statute, we point out, is not fairly portrayed as a "one-case-only regime." Brief for Petitioner 27. Rather, it covers a category of postjudgment execution claims filed

————————
*JUSTICE THOMAS joins all but Part II–C of this opinion.

by numerous plaintiffs who, in multiple civil actions, obtained evidence-based judgments against Iran together amounting to billions of dollars. Section 8772 subjects the designated assets to execution "to satisfy *any* judgment" against Iran for damages caused by specified acts of terrorism. §8772(a)(1) (emphasis added). Congress, our decisions make clear, may amend the law and make the change applicable to pending cases, even when the amendment is outcome determinative.

Adding weight to our decision, Congress passed, and the President signed, §8772 in furtherance of their stance on a matter of foreign policy. Action in that realm warrants respectful review by courts. The Executive has historically made case-specific sovereign-immunity determinations to which courts have deferred. And exercise by Congress and the President of control over claims against foreign governments, as well as foreign-government-owned property in the United States, is hardly a novelty. In accord with the courts below, we perceive in §8772 no violation of separation-of-powers principles, and no threat to the independence of the Judiciary.

## I
### A

We set out here statutory provisions relevant to this case. American nationals may file suit against state sponsors of terrorism in the courts of the United States. See 28 U. S. C. §1605A. Specifically, they may seek "money damages . . . against a foreign state for personal injury or death that was caused by" acts of terrorism, including "torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support" to terrorist activities. §1605A(a)(1). This authorization—known as the "terrorism exception"—is among enumerated excep-

tions prescribed in the Foreign Sovereign Immunities Act
of 1976 (FSIA) to the general rule of sovereign immunity.[1]

Victims of state-sponsored terrorism, like others pro-
ceeding under an FSIA exception, may obtain a judgment
against a foreign state on "establish[ing] [their] claim[s]
. . . by evidence satisfactory to the court." §1608(e).  After
gaining a judgment, however, plaintiffs proceeding under
the terrorism exception "have often faced practical and
legal difficulties" at the enforcement stage.  Brief for United
States as *Amicus Curiae* 2.   Subject to stated excep-
tions, the FSIA shields foreign-state property from execu-
tion.  §1609.  When the terrorism exception was adopted,
only foreign-state property located in the United States
and "used for a commercial activity" was available for the
satisfaction of judgments.  §1610(a)(7), (b)(3).   Further
limiting judgment-enforcement prospects, the FSIA
shields from execution property "of a foreign central bank
or monetary authority held for its own account."
§1611(b)(1).

To lessen these enforcement difficulties, Congress en-
acted the Terrorism Risk Insurance Act of 2002 (TRIA),
which authorizes execution of judgments obtained under
the FSIA's terrorism exception against "the blocked assets
of [a] terrorist party (including the blocked assets of any
agency or instrumentality of that terrorist party)."
§201(a), 116 Stat. 2337, note following 28 U. S. C. §1610.

––––––––––

[1] The FSIA "provides the sole basis for obtaining jurisdiction over a
foreign state in the courts of this country" and renders a foreign gov-
ernment "presumptively immune from the jurisdiction of United States
courts unless one of the Act's express exceptions to sovereign immunity
applies."  *OBB Personenverkehr AG* v. *Sachs*, 577 U. S. ___, ___ (2015)
(slip op., at 3) (internal quotation marks omitted); see 28 U. S. C.
§1330(a) (conferring jurisdiction over "any claim . . . with respect to
which the foreign state is not entitled to immunity"); §1604 (on
"[i]mmunity of a foreign state from jurisdiction").

A "blocked asset" is any asset seized by the Executive Branch pursuant to either the Trading with the Enemy Act (TWEA), 40 Stat. 411, 50 U. S. C. App. 1 *et seq.,* or the International Emergency Economic Powers Act (IEEPA), 91 Stat. 1625, 50 U. S. C. §1570 *et seq.* See TRIA §201(d)(2). Both measures, TWEA and IEEPA, authorize the President to freeze the assets of "foreign enemy state[s]" and their agencies and instrumentalities. Brief for United States as *Amicus Curiae* 25. These blocking regimes "put control of foreign assets in the hands of the President so that he may dispose of them in the manner that best furthers the United States' foreign-relations and national-security interests." *Ibid.* (internal quotation marks omitted).[2]

Invoking his authority under the IEEPA, the President, in February 2012, issued an Executive Order blocking "[a]ll property and interests in property of any Iranian financial institution, including the Central Bank of Iran, that are in the United States." Exec. Order No. 13599, 3 CFR 215 (2012 Comp.). The availability of these assets for execution, however, was contested.[3]

----

[2] Again expanding the availability of assets for postjudgment execution, Congress, in 2008, amended the FSIA to make available for execution the property (whether or not blocked) of a foreign state sponsor of terrorism, or its agency or instrumentality, to satisfy a judgment against that state. See §1083 of the National Defense Authorization Act for Fiscal Year 2008, 122 Stat. 341, 28 U. S. C. §1610(g). Section 1610(g) does not take precedence over "any other provision of law," as the TRIA does. See TRIA §201(a). Hence, the FSIA's central-bank immunity provision, see *supra,* at 3, limits §1610(g), but not the TRIA.

[3] As a defense to execution, Bank Markazi contended that the blocked assets were not assets "of" Bank Markazi. See TRIA §201(a). Referring to state property law, Bank Markazi asserted that the assets were "of" a financial intermediary which held them in the United States on Bank Markazi's behalf. See App. to Pet. for Cert. 96a–100a.

To place beyond dispute the availability of some of the Executive Order No. 13599-blocked assets for satisfaction of judgments rendered in terrorism cases, Congress passed the statute at issue here: §502 of the Iran Threat Reduction and Syria Human Rights Act of 2012, 126 Stat. 1258, 22 U. S. C. §8772. Enacted as a freestanding measure, not as an amendment to the FSIA or the TRIA,[4] §8772 provides that, if a court makes specified findings, "a financial asset . . . shall be subject to execution . . . in order to satisfy any judgment to the extent of any compensatory damages awarded against Iran for damages for personal injury or death caused by" the acts of terrorism enumerated in the FSIA's terrorism exception. §8772(a)(1). Section 8772(b) defines as available for execution by holders of terrorism judgments against Iran "the financial assets that are identified in and the subject of proceedings in the United States District Court for the Southern District of New York in Peterson et al. v. Islamic Republic of Iran et al., Case No. 10 Civ. 4518 (BSJ) (GWG), that were restrained by restraining notices and levies secured by the plaintiffs in those proceedings."

Before allowing execution against an asset described in §8772(b), a court must determine that the asset is:

> "(A) held in the United States for a foreign securities intermediary doing business in the United States;
> "(B) a blocked asset (whether or not subsequently unblocked) . . . ; and
> "(C) equal in value to a financial asset of Iran, including an asset of the central bank or monetary authority of the Government of Iran . . . ." §8772(a)(1).

In addition, the court in which execution is sought must

---

[4] Title 22 U. S. C. §8772(a)(1) applies "notwithstanding any other provision of law, including any provision of law relating to sovereign immunity, and preempt[s] any inconsistent provision of State law."

determine "whether Iran holds equitable title to, or the beneficial interest in, the assets . . . and that no other person possesses a constitutionally protected interest in the assets . . . under the Fifth Amendment to the Constitution of the United States." §8772(a)(2).

## B

Respondents are victims of Iran-sponsored acts of terrorism, their estate representatives, and surviving family members. See App. to Pet. for Cert. 52a–53a; Brief for Respondents 6. Numbering more than 1,000, respondents rank within 16 discrete groups, each of which brought a lawsuit against Iran pursuant to the FSIA's terrorism exception. App. to Brief for Respondents 1a–2a. All of the suits were filed in United States District Court for the District of Columbia.[5] Upon finding a clear evidentiary

_____

[5] The 16 judgments include: *Wultz* v. *Islamic Republic of Iran*, 864 F. Supp. 2d 24 (DC 2012); *Murphy* v. *Islamic Republic of Iran*, 740 F. Supp. 2d 51 (DC 2010); *Valore* v. *Islamic Republic of Iran*, 700 F. Supp. 2d 52 (DC 2010) (granting judgment in consolidation of four actions at issue here: *Valore*, No. 1:03–cv–01959; *Bonk* v. *Islamic Republic of Iran*, No. 1:08–cv–01273; *Spencer* v. *Islamic Republic of Iran*, No. 1:06–cv–00750; and *Arnold* v. *Islamic Republic of Iran*, No. 1:06–cv–00516); *Estate of Brown* v. *Islamic Republic of Iran*, No. 1:08–cv–00531 (D DC, Feb. 1, 2010); *Acosta* v. *Islamic Republic of Iran*, 574 F. Supp. 2d 15 (DC 2008); *Beer* v. *Islamic Republic of Iran*, 574 F. Supp. 2d 1 (DC 2008); *Kirschenbaum* v. *Islamic Republic of Iran*, 572 F. Supp. 2d 200 (DC 2008); *Levin* v. *Islamic Republic of Iran*, 529 F. Supp. 2d 1 (DC 2007); *Estate of Heiser* v. *Islamic Republic of Iran*, 466 F. Supp. 2d 229 (DC 2006); *Estate of Bland* v. *Islamic Republic of Iran*, No. 1:05–cv–02124 (D DC, Dec. 6, 2006); *Greenbaum* v. *Islamic Republic of Iran*, 451 F. Supp. 2d 90 (DC 2006); *Campuzano* v. *Islamic Republic of Iran*, 281 F. Supp. 2d 258 (DC 2003) (awarding judgment in both the *Rubin* action, *Rubin* v. *Islamic Republic of Iran*, No. 1:01–cv–01655, the plaintiffs of which are respondents here, and the *Campuzano* action, the plaintiffs of which are not); *Peterson* v. *Islamic Republic of Iran*, 264 F. Supp. 2d 46 (DC 2003). Three additional groups of plaintiffs with claims against Iran were voluntarily dismissed from the instant litiga-

basis for Iran's liability to each suitor, the court entered judgments by default. See, *e.g., Peterson* v. *Islamic Republic of Iran*, 264 F. Supp. 2d 46, 49 (2003). The majority of respondents sought redress for injuries suffered in connection with the 1983 bombing of the U. S. Marine barracks in Beirut, Lebanon. App. to Pet. for Cert. 21a.[6] "Together, [respondents] have obtained billions of dollars in judgments against Iran, the vast majority of which remain unpaid." *Id.,* at 53a.[7] The validity of those judgments is not in dispute. *Id.,* at 55a.

To enforce their judgments, the 16 groups of respondents first registered them in the United States District Court for the Southern District of New York. See 28 U. S. C. §1963 ("A judgment . . . may be registered . . . in any other district . . . . A judgment so registered shall have the same effect as a judgment of the district court of the district where registered and may be enforced in like manner."). They then moved under Federal Rule of Civil Procedure 69 for turnover of about $1.75 billion in bond

_____

tion after "informing the [District Court] that none of the plaintiffs in those actions ha[d] obtained judgments for damages against Iran." App. to Pet. for Cert. 19a.

[6] "At approximately 6:25 a.m. Beirut time, . . . [a] truck crashed through a . . . barrier and a wall of sandbags, and entered the barracks. When the truck reached the center of the barracks, the bomb in the truck detonated. . . ." *Peterson*, 264 F. Supp. 2d, at 56 (footnote omitted). "As a result of the Marine barracks explosion, 241 servicemen were killed . . . ." *Id.*, at 58. The United States has long recognized Iran's complicity in this attack. See H. R. Rep. No. 104–523, pt. 1, p. 9 (1996) ("After an Administration determination of Iran's involvement in the bombing of the Marine barracks in Beirut in October 1983, Iran was placed on the U. S. list of state sponsors of terrorism on January 19, 1984.").

[7] Some of these 16 judgments awarded compensatory and punitive damages. See, *e.g., Wultz*, 864 F. Supp. 2d, at 42; *Acosta*, 574 F. Supp. 2d, at 31. Both §201(a) of the TRIA and §8772(a)(1) permit execution only "to the extent of any compensatory damages."

assets held in a New York bank account—assets that, respondents alleged, were owned by Bank Markazi. See App. to Pet. for Cert. 52a–54a, 60a, and n. 1; Second Amended Complaint in No. 10–CIV–4518 (SDNY), p. 6.[8] This turnover proceeding began in 2008 when the terrorism judgment holders in *Peterson*, 264 F. Supp. 2d 46, filed writs of execution and the District Court restrained the bonds. App. to Pet. for Cert. 14a–15a, 62a. Other groups of terrorism judgment holders—some of which had filed their own writs of execution against the bonds—were joined in No. 10–CIV–4518, the *Peterson* enforcement proceeding, through a variety of procedural mechanisms.[9] It is this consolidated judgment-enforcement proceeding and assets restrained in that proceeding that §8772 addresses.

Although the enforcement proceeding was initiated prior to the issuance of Executive Order No. 13599 and the enactment of §8772, the judgment holders updated their motions in 2012 to include execution claims under §8772. Plaintiffs' Supplemental Memorandum of Law in Support of Their Motion for Partial Summary Judgment in No. 10–CIV–4518 (SDNY).[10] Making the findings necessary un-

———————

[8] Federal Rule of Civil Procedure 69(a)(1) provides: "A money judgment is enforced by writ of execution . . . . The procedure on execution—and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies."

[9] Some moved to intervene; others became part of the proceeding by way of an interpleader motion filed by Citibank. App. to Pet. for Cert. 15a, 52a–53a, n. 1; Third-Party Petition Alleging Claims in the Nature of Interpleader in No. 10–CIV–4518 (SDNY), pp. 12–14. One group of respondents intervened much later than the others, in 2013, after §8772's enactment. See App. to Pet. for Cert. 18a–19a.

[10] Before §8772's enactment, respondents' execution claims relied on the TRIA. Even earlier, *i.e.,* prior to Executive Order No. 13599, which blocked the assets and thereby opened the door to execution under the

der §8772, the District Court ordered the requested turn-over. App. to Pet. for Cert. 109a.[11]

In reaching its decision, the court reviewed the financial history of the assets and other record evidence showing that Bank Markazi owned the assets. See *id.,* at 111a–113a, and n. 17. Since at least early 2008, the court re-counted, the bond assets have been held in a New York account at Citibank directly controlled by Clearstream Banking, S. A. (Clearstream), a Luxembourg-based com-pany that serves "as an intermediary between financial institutions worldwide." *Id.,* at 56a–57a (internal quota-tion makes omitted). Initially, Clearstream held the assets for Bank Markazi and deposited interest earned on the bonds into Bank Markazi's Clearstream account. At some point in 2008, Bank Markazi instructed Clearstream to position another intermediary—Banca UBAE, S. p. A., an Italian bank—between the bonds and Bank Markazi. *Id.,* at 58a–59a. Thereafter, Clearstream deposited inter-est payments in UBAE's account, which UBAE then re-mitted to Bank Markazi. *Id.,* at 60a–61a.[12]

Resisting turnover of the bond assets, Bank Markazi and Clearstream, as the District Court observed, "filled

––––––––––

TRIA, respondents sought turnover pursuant to the FSIA's terrorism judgment execution provisions. See Second Amended Complaint in No. 10–CIV–4518 (SDNY), pp. 27, 35–36; *supra,* at 3–4, and n. 2.

[11] In April 2012, the last of the bonds matured, leaving only "cash associated with the bonds" still restrained in the New York bank account. App. to Pet. for Cert. 61a.

[12] Citibank is a "neutral stakeholder," seeking only "resolution of ownership of [the] funds." App. to Pet. for Cert. 54a (internal quotation marks omitted). UBAE did not contest turnover of the $1.75 billion in assets at issue here (though it disputed the District Court's personal jurisdiction in anticipation of other execution claims not now before us). See Memorandum of Law in Support of Banca UBAE, S. p. A.'s Opposi-tion to the Plaintiffs' Motion for Partial Summary Judgment in No. 10–CIV–4518 (SDNY), pp. 1–2.

the proverbial kitchen sink with arguments." *Id.,* at 111a. They argued, *inter alia*, the absence of subject-matter and personal jurisdiction, *id.,* at 73a–104a, asserting that the blocked assets were not assets "of" the Bank, see *supra,* at 4, n. 3, and that the assets in question were located in Luxembourg, not New York, App. to Pet. for Cert. 100a. Several of their objections to execution became irrelevant following enactment of §8772, which, the District Court noted, "sweeps away . . . any . . . federal or state law impediments that might otherwise exist, so long as the appropriate judicial determination is made." *Id.,* at 73a; §8772(a)(1) (Act applies "notwithstanding any other provision of law"). After §8772's passage, Bank Markazi changed its defense. It conceded that Iran held the requisite "equitable title to, or beneficial interest in, the assets," §8772(a)(2)(A), but maintained that §8772 could not withstand inspection under the separation-of-powers doctrine. See Defendant Bank Markazi's Supplemental Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment in No. 10–CIV–4518 (SDNY), pp. 1–3, 10–16.[13]

---

[13] In addition, Bank Markazi advanced one argument not foreclosed by §8772's text, and another that, at least in Bank Markazi's estimation, had not been rendered irrelevant by §8772. First, Bank Markazi argued that the availability of the assets for execution was a nonjusticiable political question because execution threatened to interfere with European blocking regulations. App. to Pet. for Cert. 92a–94a. Second, the Bank urged that execution would violate U. S. treaty obligations to Iran. See Defendant Bank Markazi's Supplemental Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment in No. 10–CIV–4518 (SDNY), pp. 2–3, 21–25. The District Court found these arguments unavailing. The matter was justiciable, the court concluded, because §8772's enactment demonstrated that the political branches were not troubled about interference with European blocking regulations. App. to Pet. for Cert. 94a–96a. And treaty provisions interposed no bar to enforcement of §8772 because, the court reiterated, §8772 displaces "any" inconsistent provision of law, treaty obligations

"[I]n passing §8772," Bank Markazi argued, "Congress effectively dictated specific factual findings in connection with a specific litigation—invading the province of the courts." App. to Pet. for Cert. 114a. The District Court disagreed. The ownership determinations §8772 required, see *supra,* at 8–9, the court said, "[were] not mere fig leaves," for "it [was] quite possible that the [c]ourt could have found that defendants raised a triable issue as to whether the [b]locked [a]ssets were owned by Iran, or that Clearstream and/or UBAE ha[d] some form of beneficial or equitable interest." App. to Pet. for Cert. 115a. Observing from the voluminous filings that "[t]here [was] . . . plenty . . . to [litigate]," the court described §8772 as a measure that "merely chang[es] the law applicable to pending cases; it does not usurp the adjudicative function assigned to federal courts." *Ibid.* (internal quotation marks omitted). Further, the court reminded, "Iran's liability and its required payment of damages was . . . established years prior to the [enactment of §8772]"; "[a]t issue [here] is merely execution [of judgments] on assets present in this district." *Id.,* at 116a.[14]

The Court of Appeals for the Second Circuit unanimously affirmed. *Peterson* v. *Islamic Republic of Iran*, 758 F. 3d 185 (2014).[15] On appeal, Bank Markazi again argued that §8772 violates the separation of powers "by compelling the courts to reach a predetermined result in this case." *Id.,* at 191. In accord with the District Court, the Second

———————
included. *Id.*, at 101a–102a.

[14] Bank Markazi and Clearstream unsuccessfully sought to defeat turnover on several other constitutional grounds: the Bill of Attainder, *Ex post facto*, Equal Protection, and Takings Clauses. See *id.,* at 115a–119a. Those grounds are no longer pressed.

[15] Clearstream and UBAE settled with respondents before the Second Circuit's decision. *Peterson* v. *Islamic Republic of Iran*, 758 F. 3d 185, 189 (2014).

Circuit responded that "§8772 does not compel judicial findings [or results] under old law"; "rather, it retroactively changes the law applicable in this case, a permissible exercise of legislative authority." *Ibid.* Congress may so prescribe, the appeals court noted, "even when the result under the revised law is clear." *Ibid.*

To consider the separation-of-powers question Bank Markazi presents, we granted certiorari, 576 U. S. ___ (2015), and now affirm.[16]

## II

Article III of the Constitution establishes an independent Judiciary, a Third Branch of Government with the "province and duty . . . to say what the law is" in particular cases and controversies. *Marbury* v. *Madison*, 1 Cranch 137, 177 (1803). Necessarily, that endowment of authority blocks Congress from "requir[ing] federal courts to exercise the judicial power in a manner that Article III forbids." *Plaut* v. *Spendthrift Farm, Inc.*, 514 U. S. 211, 218 (1995). Congress, no doubt, "may not usurp a court's power to interpret and apply the law to the [circumstances] before it," Brief for Former Senior Officials of the Office of Legal Counsel as *Amici Curiae* 3, 6, for "[t]hose who apply [a] rule to particular cases, must of necessity expound and interpret that rule," *Marbury*, 1 Cranch, at 177.[17] And our decisions place off limits to Congress

_____

[16] Respondents suggest that we decide this case on the ground that §201(a) of the TRIA independently authorizes execution against the assets here involved, instead of reaching the constitutional question petitioner raises regarding §8772. Brief for Respondents 53. The Court of Appeals, however, did not "resolve th[e] dispute under the TRIA," 758 F. 3d, at 189, nor do we. This Court generally does not decide issues unaddressed on first appeal—especially where, as here, the matter falls outside the question presented and has not been thoroughly briefed before us.

[17] Consistent with this limitation, respondents rightly acknowledged

"vest[ing] review of the decisions of Article III courts in officials of the Executive Branch." *Plaut,* 514 U. S., at 218 (citing *Hayburn's Case*, 2 Dall. 409 (1792), and, *e.g., Chicago & Southern Air Lines, Inc.* v. *Waterman S. S. Corp.*, 333 U. S. 103, 114 (1948)). Congress, we have also held, may not "retroactively comman[d] the federal courts to reopen final judgments." *Plaut*, 514 U. S., at 219.

### A

Citing *United States* v. *Klein*, 13 Wall. 128 (1872), Bank Markazi urges a further limitation. Congress treads impermissibly on judicial turf, the Bank maintains, when it "prescribe[s] rules of decision to the Judicial Department . . . in [pending] cases." *Id.,* at 146. According to the Bank, §8772 fits that description. Brief for Petitioner 19, 43. *Klein* has been called "a deeply puzzling decision," Meltzer, Congress, Courts, and Constitutional Remedies, 86 Geo. L. J. 2537, 2538 (1998).[18] More recent decisions, however, have made it clear that *Klein* does not inhibit Congress from "amend[ing] applicable law." *Robertson* v. *Seattle Audubon Soc.*, 503 U. S. 429, 441 (1992); see *id.,* at 437–438; *Plaut*, 514 U. S., at 218 (*Klein*'s "prohibition does not take hold when Congress 'amend[s] applicable law.'"

———————

at oral argument that Congress could not enact a statute directing that, in "Smith v. Jones," "Smith wins." Tr. of Oral Arg. 40. Such a statute would create no new substantive law; it would instead direct the court how pre-existing law applies to particular circumstances. See *infra* this page and 14–19. THE CHIEF JUSTICE challenges this distinction, *post,* at 11–12, but it is solidly grounded in our precedent. See *Robertson* v. *Seattle Audubon Soc.*, 503 U. S. 429, 439 (1992) (A statute is invalid if it "fail[s] to supply new law, but direct[s] results under old law."), discussed in R. Fallon, J. Manning, D. Meltzer, & D. Shapiro, Hart and Wechsler's The Federal Courts and the Federal System 324 (7th ed. 2015).

[18] See also *id*., at 323 (calling *Klein* a "delphic opinion"); Tyler, The Story of *Klein*: The Scope of Congress's Authority to Shape the Jurisdiction of the Federal Courts, in Federal Courts Stories 87 (V. Jackson & J. Resnik eds. 2010) (calling *Klein* "baffl[ing]") (Tyler).

(quoting *Robertson*, 503 U. S., at 441)). Section 8772, we hold, did just that.

*Klein* involved Civil War legislation providing that persons whose property had been seized and sold in wartime could recover the proceeds of the sale in the Court of Claims upon proof that they had "never given any aid or comfort to the present rebellion." Ch. 120, §3, 12 Stat. 820; see *Klein*, 13 Wall., at 139. In 1863, President Lincoln pardoned "persons who . . . participated in the . . . rebellion" if they swore an oath of loyalty to the United States. Presidential Proclamation No. 11, 13 Stat. 737. One of the persons so pardoned was a southerner named Wilson, whose cotton had been seized and sold by Government agents. Klein was the administrator of Wilson's estate. 13 Wall., at 132. In *United States* v. *Padelford*, 9 Wall. 531, 543 (1870), this Court held that the recipient of a Presidential pardon must be treated as loyal, *i.e.,* the pardon operated as "a complete substitute for proof that [the recipient] gave no aid or comfort to the rebellion." Thereafter, Klein prevailed in an action in the Court of Claims, yielding an award of $125,300 for Wilson's cotton. 13 Wall., at 132.

During the pendency of an appeal to this Court from the Court of Claims judgment in *Klein*, Congress enacted a statute providing that no pardon should be admissible as proof of loyalty. Moreover, acceptance of a pardon without disclaiming participation in the rebellion would serve as conclusive evidence of disloyalty. The statute directed the Court of Claims and the Supreme Court to dismiss for want of jurisdiction any claim based on a pardon. 16 Stat. 235; R. Fallon, J. Manning, D. Meltzer, & D. Shapiro, Hart and Wechsler's The Federal Courts and the Federal System 323, n. 29 (7th ed. 2015) (Hart and Wechsler). Affirming the judgment of the Court of Claims, this Court held that Congress had no authority to "impai[r] the effect of a pardon," for the Constitution entrusted the pardon power

"[t]o the executive alone." *Klein*, 13 Wall., at 147. The Legislature, the Court stated, "cannot change the effect of . . . a pardon any more than the executive can change a law." *Id.,* at 148. Lacking authority to impair the pardon power of the Executive, Congress could not "direc[t] [a] court to be instrumental to that end." *Ibid.* In other words, the statute in *Klein* infringed the judicial power, not because it left too little for courts to do, but because it attempted to direct the result without altering the legal standards governing the effect of a pardon—standards Congress was powerless to prescribe. See *id.,* at 146–147; *Robertson*, 503 U. S., at 438 (Congress may not "compe[l] . . . findings or results under old law").[19]

Bank Markazi, as earlier observed, *supra,* at 13, argues that §8772 conflicts with *Klein*. The Bank points to a statement in the *Klein* opinion questioning whether "the legislature may prescribe rules of decision to the Judicial Department . . . in cases pending before it." 13 Wall., at 146. One cannot take this language from *Klein* "at face value," however, "for congressional power to make valid statutes retroactively applicable to pending cases has often been recognized." Hart and Wechsler 324. See, *e.g., United States* v. *Schooner Peggy*, 1 Cranch 103, 110 (1801). As we explained in *Landgraf* v. *USI Film Products*, 511 U. S. 244, 267 (1994), the restrictions that the Constitution places on retroactive legislation "are of limited scope":

-------------

[19] Given the issue before the Court—Presidential pardons Congress sought to nullify by withdrawing federal-court jurisdiction—commentators have rightly read *Klein* to have at least this contemporary significance: Congress "may not exercise [its authority, including its power to regulate federal jurisdiction,] in a way that requires a federal court to act unconstitutionally." Meltzer, Congress, Courts, and Constitutional Remedies, 86 Geo. L. J. 2537, 2549 (1998). See also Tyler 112 ("Congress may not employ the courts in a way that forces them to become active participants in violating the Constitution.").

"The *Ex Post Facto* Clause flatly prohibits retroactive application of penal legislation. Article I, §10, cl. 1, prohibits States from passing . . . laws 'impairing the Obligation of Contracts.' The Fifth Amendment's Takings Clause prevents the Legislature (and other government actors) from depriving private persons of vested property rights except for a 'public use' and up-on payment of 'just compensation.' The prohibitions on 'Bills of Attainder' in Art. I, §§ 9–10, prohibit legis-latures from singling out disfavored persons and met-ing out summary punishment for past conduct. The Due Process Clause also protects the interests in fair notice and repose that may be compromised by retro-active legislation; a justification sufficient to validate a statute's prospective application under the Clause 'may not suffice' to warrant its retroactive applica-tion." *Id.,* at 266–267 (citation and footnote omitted).

"Absent a violation of one of those specific provisions," when a new law makes clear that it is retroactive, the arguable "unfairness of retroactive civil legislation is not a sufficient reason for a court to fail to give [that law] its intended scope." *Id.,* at 267–268. So yes, we have af-firmed, Congress may indeed direct courts to apply newly enacted, outcome-altering legislation in pending civil cases. See *Plaut*, 514 U. S., at 226. Any lingering doubts on that score have been dispelled by *Robertson*, 503 U. S., at 441, and *Plaut*, 514 U. S., at 218.

Bank Markazi argues most strenuously that §8772 did not simply amend pre-existing law. Because the judicial findings contemplated by §8772 were "foregone conclu-sions," the Bank urges, the statute "effectively" directed certain factfindings and specified the outcome under the amended law. See Brief for Petitioner 42, 47. See also *post,* at 12–13. Recall that the District Court, closely monitoring the case, disagreed. *Supra,* at 10–11; App. to

Pet. for Cert. 115a ("[The] determinations [required by §8772] [were] not mere fig leaves," for "it [was] quite possible that the [c]ourt could have found that defendants raised a triable issue as to whether the [b]locked [a]ssets were owned by Iran, or that Clearstream and/or UBAE ha[d] some form of beneficial or equitable interest.").[20]

In any event, a statute does not impinge on judicial power when it directs courts to apply a new legal standard to undisputed facts. "When a plaintiff brings suit to enforce a legal obligation it is not any less a case or controversy upon which a court possessing the federal judicial power may rightly give judgment, because the plaintiff's claim is uncontested or incontestable." *Pope* v. *United States*, 323 U. S. 1, 11 (1944). In *Schooner Peggy*, 1

_____

[20] The District Court understandably concluded that §8772 left it "plenty . . . to adjudicate." App. to Pet. for Cert. 115a. For one, the statute did not define its key terms, "beneficial interest" and "equitable title." To arrive at fitting definitions, the District Court consulted legal dictionaries and precedent. See *id.,* at 111a–112a; *Zivotofsky* v. *Clinton*, 566 U. S. ___, ___ (2012) (slip op, at 7) (Interpretation of statutes "is a familiar judicial exercise."). Further, §8772 required the District Court to determine whether the Bank owned the assets in question. §8772(a)(2)(A). Clearstream contended that there were triable issues as to whether Bank Markazi was the owner of the blocked assets. App. to Pet. for Cert. 37a–39a, 111a. The court rejected that contention, finding that Clearstream and UBAE were merely account holders, maintaining the assets "on behalf of" the Bank. *Id.,* at 112a–113a; see *id.,* at 38a–39a. Next, §8772 required the court to determine whether any party, other than the Bank, possessed a "constitutionally protected interest" in the assets. §8772(a)(2)(B). Clearstream argued that it had such an interest, but the court disagreed. App. to Pet. for Cert. 117a–118a (determining that Clearstream had no constitutionally protected "investment-backed expectatio[n]" in the assets). Finally, prior to the statute's enactment, Bank Markazi and Clearstream had argued that the assets in question were located in Luxembourg, not New York. *Supra,* at 10. Leaving the issue for court resolution, Congress, in §8772(a)(1), required the District Court to determine whether the assets were "held in the United States."

Cranch, at 109–110, for example, this Court applied a newly ratified treaty that, by requiring the return of captured property, effectively permitted only one possible outcome. And in *Robertson*, 503 U. S., at 434–435, 438–439, a statute replaced governing environmental-law restraints on timber harvesting with new legislation that permitted harvesting in all but certain designated areas. Without inquiring whether the new statute's application in pending cases was a "foregone conclusio[n]," Brief for Petitioner 47, we upheld the legislation because it left for judicial determination whether any particular actions violated the new prescription. In short, §8772 changed the law by establishing new substantive standards, entrusting to the District Court application of those standards to the facts (contested or uncontested) found by the court.

Resisting this conclusion, THE CHIEF JUSTICE compares §8772 to a hypothetical "law directing judgment for Smith if the court finds that Jones was duly served with notice of the proceedings." *Post,* at 12–13.[21] Of course, the hypothesized law would be invalid—as would a law directing judgment for Smith, for instance, if the court finds that the sun rises in the east. For one thing, a law so cast may well be irrational and, therefore, unconstitutional for reasons distinct from the separation-of-powers issues considered here. See, *e.g., infra,* at 21, n. 27. For another, the law imagined by the dissent does what *Robertson* says Congress cannot do: Like a statute that directs, in "Smith v. Jones," "Smith wins," *supra,* at 12–13, n. 17, it "compel[s] . . . findings or results under old law," for it fails to supply any new legal standard effectuating

---

[21] Recall, again, that respondents are judgment creditors who prevailed on the merits of their respective cases. Section 8772 serves to facilitate their ability to collect amounts due to them from assets of the judgment debtor.

the lawmakers' reasonable policy judgment, 503 U. S., at 438.[22]  By contrast, §8772 provides a new standard clarifying that, if Iran owns certain assets, the victims of Iran-sponsored terrorist attacks will be permitted to execute against those assets.  Applying laws implementing Congress' policy judgments, with fidelity to those judgments, is commonplace for the Judiciary.

## B

Section 8772 remains "unprecedented," Bank Markazi charges, because it "prescribes a rule for a single pending case—identified by caption and docket number."  Brief for Petitioner 17.[23]  The amended law in *Robertson*, however, also applied to cases identified by caption and docket number, 503 U. S., at 440, and was nonetheless upheld. Moreover, §8772, as already described, see *supra,* at 6–8, facilitates execution of judgments in 16 suits, together encompassing more than 1,000 victims of Iran-sponsored terrorist attacks.[24]  Although consolidated for administra-

———————

[22]The dissent also analogizes §8772 to a law that makes "conclusive" one party's flimsy evidence of a boundary line in a pending property dispute, notwithstanding that the governing law ordinarily provides that an official map establishes the boundary. *Post,* at 1.  Section 8772, however, does not restrict the evidence on which a court may rely in making the required findings.  A more fitting analogy for depicting §8772's operation might be: In a pending property dispute, the parties contest whether an ambiguous statute makes a 1990 or 2000 county map the relevant document for establishing boundary lines.  To clarify the matter, the legislature enacts a law specifying that the 2000 map supersedes the earlier map.

[23]At oral argument, Bank Markazi clarified that its argument extended beyond a single pending case, encompassing as well "a limited category of cases."  Tr. of Oral Arg. 5.  See also *id.,* at 57–58.

[24]Section 8772's limitation to one consolidated proceeding operates unfairly, Bank Markazi suggests, because other judgment creditors "would be subject to a completely different rule" if they "sought to execute against the same assets" outside No. 10–CIV–4518.  Brief for

tive purposes at the execution stage,[25] the judgment-
execution claims brought pursuant to Federal Rule of Civil
Procedure 69 were not independent of the original actions
for damages and each claim retained its separate charac-
ter.  See *Mackey* v. *Lanier Collection Agency & Service,
Inc.*, 486 U. S. 825, 834–835, n. 10 (1988) (postjudgment
garnishment action brought under Rule 69 is part of the
"process to enforce a judgment," not a new suit (alteration
omitted and emphasis deleted)); 10 Cyclopedia of Federal
Procedure §36:8, p. 385 (3 ed. 2010) ("Proceedings in exe-
cution are proceedings in the action itself . . . ."); 9A C.
Wright & A. Miller, Federal Practice and Procedure §2382,
p. 10 (3d ed. 2008) ("[A]ctions do not lose their separate
identity because of consolidation.").[26]

The Bank's argument is further flawed, for it rests on
the assumption that legislation must be generally applic-
able, that "there is something wrong with particularized
legislative action."  *Plaut*, 514 U. S., at 239, n. 9.  We have

_____

Petitioner 26 (citing §8772(c) ("Nothing in this section shall be con-
strued . . . to affect . . . any proceedings other than" No. 10–CIV–4518)).
But nothing in §8772 prevented additional judgment creditors from
joining the consolidated proceeding after the statute's enactment.
Indeed, one group of respondents did so.  See *supra*, at 8, n. 9.

[25] District courts routinely consolidate multiple related matters for a
single decision on common issues.  See, *e.g., Securities Investor Protec-
tion Corp.* v. *Bernard L. Madoff Inv. Securities LLC*, 476 B. R. 715, 717
(SDNY 2012) (deciding several legal questions arising in over 80 cases
concerning "the massive Ponzi scheme perpetrated by Bernard L.
Madoff").

[26] Questioning this understanding of the proceedings below, THE
CHIEF JUSTICE emphasizes that many of the judgment creditors were
joined in the *Peterson* enforcement proceeding by interpleader.  See
*post,* at 8, n. 1.  That is true, *supra,* at 8, n. 9, but irrelevant.  As ex-
plained above, execution proceedings are continuations of merits
proceedings, not new lawsuits.  Thus, the fact that many creditors
joined by interpleader motion did not transform execution claims in 16
separate suits into "a single case."  *Post,* at 8, n. 1.

found that assumption suspect:

> "While legislatures usually act through laws of general applicability, that is by no means their only legitimate mode of action. Private bills in Congress are still common, and were even more so in the days before establishment of the Claims Court. Even laws that impose a duty or liability upon a single individual or firm are not on that account invalid—or else we would not have the extensive jurisprudence that we do concerning the Bill of Attainder Clause, including cases which say that [the Clause] requires not merely 'singling out' but also *punishment*, see, *e.g., United States* v. *Lovett*, 328 U. S. 303, 315–318 (1946), [or] a case [holding] that Congress may legislate 'a legitimate class of one,' *Nixon* v. *Administrator of General Services*, 433 U. S. 425, 472 (1977)." *Ibid.*[27]

This Court and lower courts have upheld as a valid exercise of Congress' legislative power diverse laws that governed one or a very small number of specific subjects. *E.g., Regional Rail Reorganization Act Cases*, 419 U. S. 102, 158–161 (1974) (upholding Act that applied to specific railroads in a single region); *Pope*, 323 U. S., at 9–14 (upholding special Act giving a contractor the right to recover additional compensation from the Government); *The Clinton Bridge*, 10 Wall. 454, 462–463 (1870) (upholding Act governing a single bridge); *Pennsylvania* v. *Wheeling & Belmont Bridge Co.*, 18 How. 421, 430–432 (1856) (similar); *Biodiversity Assoc.* v. *Cables*, 357 F. 3d 1152, 1156, 1164–1171 (CA10 2004) (upholding law that abro-

---

[27] Laws narrow in scope, including "class of one" legislation, may violate the Equal Protection Clause if arbitrary or inadequately justified. *Village of Willowbrook* v. *Olech*, 528 U. S. 562, 564 (2000) (*per curiam*) (internal quotation marks omitted); *New Orleans* v. *Dukes*, 427 U. S. 297, 305–306 (1976) (*per curiam*).

gated specific settlement agreement between U. S. Forest Service and environmental groups); *SeaRiver Maritime Financial Holdings, Inc.* v. *Mineta*, 309 F. 3d 662, 667, 674–675 (CA9 2002) (upholding law that effectively applied to a single oil tanker); *National Coalition To Save Our Mall* v. *Norton*, 269 F. 3d 1092, 1097 (CADC 2001) (upholding law that applied to a single memorial).

C

We stress, finally, that §8772 is an exercise of congressional authority regarding foreign affairs, a domain in which the controlling role of the political branches is both necessary and proper. See, *e.g., Zivotofsky* v. *Kerry*, 576 U. S. ___, ___ (2015) (slip op., at 19). In furtherance of their authority over the Nation's foreign relations, Congress and the President have, time and again, as exigencies arose, exercised control over claims against foreign states and the disposition of foreign-state property in the United States. See *Dames & Moore* v. *Regan*, 453 U. S. 654, 673–674, 679–681 (1981) (describing this history). In pursuit of foreign policy objectives, the political branches have regulated specific foreign-state assets by, *inter alia*, blocking them or governing their availability for attachment. See *supra,* at 3–4 (describing the TWEA and the IEEPA); *e.g., Dames & Moore*, 453 U. S., at 669–674. Such measures have never been rejected as invasions upon the Article III judicial power. Cf. *id.,* at 674 (Court resists the notion "that the Federal Government as a whole lacked the power" to "nullif[y] . . . attachments and orde[r] the transfer of [foreign-state] assets.").[28]

––––––––––

[28] THE CHIEF JUSTICE correctly notes that the Court in *Dames & Moore* v. *Regan*, 453 U. S. 654, 661 (1981), urged caution before extending its analysis to "other situations" not presented in that case. *Post,* at 15. Much of the Court's cause for concern, however, was the risk that the ruling could be construed as license for the broad exercise of unilat-

Particularly pertinent, the Executive, prior to the enactment of the FSIA, regularly made case-specific determinations whether sovereign immunity should be recognized, and courts accepted those determinations as binding. See *Republic of Austria* v. *Altmann*, 541 U. S. 677, 689–691 (2004); *Ex parte Peru*, 318 U. S. 578, 588–590 (1943). As this Court explained in *Republic of Mexico* v. *Hoffman*, 324 U. S. 30, 35 (1945), it is "not for the courts to deny an immunity which our government has seen fit to allow, or to allow an immunity on new grounds which the government has not seen fit to recognize." This practice, too, was never perceived as an encroachment on the federal courts' jurisdiction. See *Dames & Moore*, 453 U. S., at 684–685 ("[P]rior to the enactment of the FSIA [courts would not have] reject[ed] as an encroachment on their jurisdiction the President's determination of a foreign state's sovereign immunity.").

Enacting the FSIA in 1976, Congress transferred from the Executive to the courts the principal responsibility for determining a foreign state's amenability to suit. See *Verlinden B. V.* v. *Central Bank of Nigeria*, 461 U. S. 480, 488–489 (1983). But it remains Congress' prerogative to alter a foreign state's immunity and to render the alteration dispositive of judicial proceedings in progress. See *Republic of Iraq* v. *Beaty*, 556 U. S. 848, 856–857, 865 (2009). By altering the law governing the attachment of particular property belonging to Iran, Congress acted comfortably within the political branches' authority over foreign sovereign immunity and foreign-state assets.

\*          \*          \*

For the reasons stated, we are satisfied that §8772—a

---

eral executive power. See 453 U. S., at 688; *American Ins. Assn.* v. *Garamendi*, 539 U. S. 396, 438 (2003) (GINSBURG, J., dissenting). As §8772 is a law passed by Congress and signed by the President, that risk is nonexistent here.

statute designed to aid in the enforcement of federal-court judgments—does not offend "separation of powers principles . . . protecting the role of the independent Judiciary within the constitutional design." *Miller* v. *French*, 530 U. S. 327, 350 (2000). The judgment of the Court of Appeals for the Second Circuit is therefore

*Affirmed.*

# SUPREME COURT OF THE UNITED STATES

———————

No. 14–770

———————

## BANK MARKAZI, AKA THE CENTRAL BANK OF IRAN, PETITIONER *v.* DEBORAH PETERSON, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[April 20, 2016]

CHIEF JUSTICE ROBERTS, with whom JUSTICE SOTOMAYOR joins, dissenting.

Imagine your neighbor sues you, claiming that your fence is on his property. His evidence is a letter from the previous owner of your home, accepting your neighbor's version of the facts. Your defense is an official county map, which under state law establishes the boundaries of your land. The map shows the fence on your side of the property line. You also argue that your neighbor's claim is six months outside the statute of limitations.

Now imagine that while the lawsuit is pending, your neighbor persuades the legislature to enact a new statute. The new statute provides that for your case, and your case alone, a letter from one neighbor to another is conclusive of property boundaries, and the statute of limitations is one year longer. Your neighbor wins. Who would you say decided your case: the legislature, which targeted your specific case and eliminated your specific defenses so as to ensure your neighbor's victory, or the court, which presided over the *fait accompli*?

That question lies at the root of the case the Court confronts today. Article III of the Constitution commits the power to decide cases to the Judiciary alone. See *Stern* v. *Marshall*, 564 U. S. 462, 484 (2011). Yet, in this case, Congress arrogated that power to itself. Since 2008, re-

spondents have sought $1.75 billion in assets owned by
Bank Markazi, Iran's central bank, in order to satisfy
judgments against Iran for acts of terrorism. The Bank
has vigorously opposed those efforts, asserting numerous
legal defenses. So, in 2012, four years into the litigation,
respondents persuaded Congress to enact a statute, 22
U. S. C. §8772, that for this case alone eliminates each of
the defenses standing in respondents' way. Then, having
gotten Congress to resolve all outstanding issues in their
favor, respondents returned to court . . . and won.

Contrary to the majority, I would hold that §8772 vio-
lates the separation of powers. No less than if it had
passed a law saying "respondents win," Congress has
decided this case by enacting a bespoke statute tailored to
this case that resolves the parties' specific legal disputes
to guarantee respondents victory.

## I
### A

Article III, §1 of the Constitution vests the "judicial
Power of the United States" in the Federal Judiciary.
That provision, this Court has observed, "safeguards the
role of the Judicial Branch in our tripartite system."
*Commodity Futures Trading Comm'n* v. *Schor*, 478 U. S.
833, 850 (1986). It establishes the Judiciary's independ-
ence by giving the Judiciary distinct and inviolable au-
thority. "Under the basic concept of separation of powers,"
the judicial power "can no more be shared with another
branch than the Chief Executive, for example, can share
with the Judiciary the veto power, or the Congress share
with the Judiciary the power to override a Presidential
veto." *Stern*, 564 U. S., at 483 (internal quotation marks
omitted). The separation of powers, in turn, safeguards
individual freedom. See *Bond* v. *United States*, 564 U. S.
211, 223 (2011). As Hamilton wrote, quoting Montes-
quieu, "'there is no liberty if the power of judging be not

separated from the legislative and executive powers.'"
The Federalist No. 78, p. 466 (C. Rossiter ed. 1961); see
Montesquieu, The Spirit of the Laws 157 (A. Cohler, B.
Miller, & H. Stone eds. 1989) (Montesquieu).

The question we confront today is whether §8772 violates Article III by invading the judicial power.

### B

"The Framers of our Constitution lived among the ruins
of a system of intermingled legislative and judicial powers." *Plaut* v. *Spendthrift Farm, Inc.*, 514 U. S. 211, 219
(1995). We surveyed those ruins in *Plaut* to determine the
scope of the judicial power under Article III, and we ought
to return to them today for that same purpose.

Throughout the 17th and 18th centuries, colonial legislatures performed what are now recognized as core judicial
roles. They "functioned as courts of equity of last resort,
hearing original actions or providing appellate review of
judicial judgments." *Ibid.* They "constantly heard private
petitions, which often were only the complaints of one
individual or group against another, and made final judgments on these complaints." G. Wood, The Creation of the
American Republic 1776–1787, pp. 154–155 (1969). And
they routinely intervened in cases still pending before
courts, granting continuances, stays of judgments, "new
trials, and other kinds of relief in an effort to do what 'is
agreeable to Right and Justice.'" *Id.,* at 155; see Judicial
Action by the Provincial Legislature of Massachusetts, 15
Harv. L. Rev. 208, 216–218 (1902) (collecting examples of
such laws).

The judicial power exercised by colonial legislatures was
often expressly vested in them by the colonial charter or
statute. In the Colonies of Massachusetts, Connecticut,
and Rhode Island, for example, the assemblies officially
served as the highest court of appeals. See 1 The Public
Records of the Colony of Connecticut 25 (Trumbull ed.

1850); M. Clarke, Parliamentary Privilege in the American Colonies 31–33 (1943). Likewise, for more than a half century, the colonial assembly of Virginia could review and set aside court judgments. *Id.,* at 37–38. And in New Hampshire, where British authorities directed judicial appeals to the governor and his council, those officials often referred such matters to the assembly for decision. *Id.,* at 33. Colonial assemblies thus sat atop the judicial pyramid, with the final word over when and how private disputes would be resolved.

Legislative involvement in judicial matters intensified during the American Revolution, fueled by the "vigorous, indeed often radical, populism of the revolutionary legislatures and assemblies." *Plaut*, 514 U. S., at 219; see Wood, *supra,* at 155–156. The Pennsylvania Constitution of 1776 epitomized the ethos of legislative supremacy. It established a unicameral assembly unconstrained by judicial review and vested with authority to "'redress grievances.'" Report of the Committee of the Pennsylvania Council of Censors 42 (F. Bailey ed. 1784) (Council Report); see Williams, The State Constitutions of the Founding Decade: Pennsylvania's Radical 1776 Constitution and Its Influences on American Constitutionalism, 62 Temp. L. Rev. 541, 547–548, 556 (1989). The assembly, in turn, invoked that authority to depart from legal rules in resolving private disputes in order to ease the "hardships which will always arise from the operation of general laws." Council Report 42–43.

The Revolution-era "crescendo of legislative interference with private judgments of the courts," however, soon prompted a "sense of a sharp necessity to separate the legislative from the judicial power." *Plaut*, 514 U. S., at 221. In 1778, an influential critique of a proposed (and ultimately rejected) Massachusetts constitution warned that "[i]f the legislative and judicial powers are united, the maker of the law will also interpret it; and the law may

then speak a language, dictated by the whims, the caprice, or the prejudice of the judge." The Essex Result, in The Popular Sources of Political Authority: Documents on the Massachusetts Constitution of 1780, p. 337 (O. Handlin & M. Handlin eds. 1966). In Virginia, Thomas Jefferson complained that the assembly had, "in many instances, decided rights which should have been left to judiciary controversy." Jefferson, Notes on the State of Virginia 120 (Peden ed. 1982). And in Pennsylvania, the Council of Censors—a body appointed to assess compliance with the state constitution—decried the state assembly's practice of "extending their deliberations to the cases of individuals" instead of deferring to "the usual process of law," citing instances when the assembly overturned fines, settled estates, and suspended prosecutions. Council Report 38, 42. "[T]here is reason to think," the Censors observed, "that favour and partiality have, from the nature of public bodies of men, predominated in the distribution of this relief." *Id.,* at 38.

Vermont's Council of Censors sounded similar warnings. Its 1786 report denounced the legislature's "assumption of the judicial power," which the legislature had exercised by staying and vacating judgments, suspending lawsuits, resolving property disputes, and "legislating for individuals, and for particular cases." Vermont State Papers 1779–1786, pp. 537–542 (W. Slade ed. 1823). The Censors concluded that "[t]he legislative body is, in truth, by no means competent to the determination of causes between party and party," having exercised judicial power "without being shackled with rules," guided only by "crude notions of equity." *Id.,* at 537, 540.

The States' experiences ultimately shaped the Federal Constitution, figuring prominently in the Framers' decision to devise a system for securing liberty through the division of power:

> "Before and during the debates on ratification, Madison, Jefferson, and Hamilton each wrote of the factional disorders and disarray that the system of legislative equity had produced in the years before the framing; and each thought that the separation of the legislative from the judicial power in the new Constitution would cure them." *Plaut*, 514 U. S., at 221.

As Professor Manning has concluded, "Article III, in large measure, reflects a reaction against the practice" of legislative interference with state courts. Manning, Response, Deriving Rules of Statutory Interpretation from the Constitution, 101 Colum. L. Rev. 1648, 1663 (2001).

Experience had confirmed Montesquieu's theory. The Framers saw that if the "power of judging . . . were joined to legislative power, the power over the life and liberty of the citizens would be arbitrary." Montesquieu 157. They accordingly resolved to take the unprecedented step of establishing a "truly distinct" judiciary. The Federalist No. 78, at 466 (A. Hamilton). To help ensure the "complete independence of the courts of justice," *ibid.*, they provided life tenure for judges and protection against diminution of their compensation. But such safeguards against indirect interference would have been meaningless if Congress could simply exercise the judicial power directly. The central pillar of judicial independence was Article III itself, which vested "[t]he judicial Power of the United States" in "one supreme Court" and such "inferior Courts" as might be established. The judicial power was to be the Judiciary's alone.

## II
### A

Mindful of this history, our decisions have recognized three kinds of "unconstitutional restriction[s] upon the exercise of judicial power." *Plaut*, 514 U. S., at 218. Two concern the effect of judgments once they have been ren-

dered: "Congress cannot vest review of the decisions of Article III courts in officials of the Executive Branch," *ibid.*, for to do so would make a court's judgment merely "an advisory opinion in its most obnoxious form," *Chicago & Southern Air Lines, Inc.* v. *Waterman S. S. Corp.*, 333 U. S. 103, 113 (1948). And Congress cannot "retroactively command[ ] the federal courts to reopen final judgments," because Article III "gives the Federal Judiciary the power, not merely to rule on cases, but to *decide* them, subject to review only by superior courts in the Article III hierarchy." *Plaut,* 514 U. S., at 218–219. Neither of these rules is directly implicated here.

This case is about the third type of unconstitutional interference with the judicial function, whereby Congress assumes the role of judge and decides a particular pending case in the first instance. Section 8772 does precisely that, changing the law—for these proceedings alone— simply to guarantee that respondents win. The law serves no other purpose—a point, indeed, that is hardly in dispute. As the majority acknowledges, the statute "'sweeps away . . . any . . . federal or state law impediments that might otherwise exist'" to bar respondents from obtaining Bank Markazi's assets. *Ante,* at 9–10 (quoting App. to Pet. for Cert. 73a). In the District Court, Bank Markazi had invoked sovereign immunity under the Foreign Sovereign Immunities Act of 1976, 28 U. S. C. §1611(b)(1). Brief for Petitioner 28. Section 8772(a)(1) eliminates that immunity. Bank Markazi had argued that its status as a separate juridical entity under federal common law and international law freed it from liability for Iran's debts. See *First Nat. City Bank* v. *Banco Para el Comercio Exterior de Cuba,* 462 U. S. 611, 624–627 (1983); Brief for Petitioner 27–28. Section 8772(d)(3) ensures that the Bank is liable. Bank Markazi had argued that New York law did not allow respondents to execute their judgments against the Bank's assets. See N. Y. U. C. C. Law Ann. §8–112(c)

(West 2002); see also App. to Pet. for Cert. 126a (agreeing with this argument). Section 8772(a)(1) makes those assets subject to execution. See *id.,* at 97a.

Section 8772 authorized attachment, moreover, only for the

> "financial assets that are identified in and the subject of proceedings in the United States District Court for the Southern District of New York in Peterson et al. v. Islamic Republic of Iran et al., Case No. 10 Civ. 4518 (BSJ) (GWG), that were restrained by restraining notices and levies secured by the plaintiffs in those proceedings . . . ." §8772(b).

And lest there be any doubt that Congress's sole concern was deciding this particular case, rather than establishing any generally applicable rules, §8772 provided that nothing in the statute "shall be construed . . . to affect the availability, or lack thereof, of a right to satisfy a judgment in any other action against a terrorist party in any proceedings other than" these. §8772(c).[1]

―――――――――

[1] The majority quarrels with the description of §8772 as being directed to a single case, noting that the claimants had sought attachment of the assets in various prior proceedings. *Ante,* at 18. Those proceedings, however, were not simply consolidated below, but rather were joined in the single interpleader action that was referenced by docket number in §8772. See §8772(b). See generally 7 C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure §1702 (3d ed. 2001) (explaining that interpleader is a "joinder device" that brings together multiple claimants to a piece of property in a "single" action to "protect[ ] the stakeholder from the vexation of multiple suits"). That is presumably why respondents did not dispute Bank Markazi's characterization of the proceedings as "a single pending case" when they opposed certiorari, Pet. for Cert. i, and why the majority offers no citation to refute Wright & Miller's characterization of an interpleader action as a "single proceeding," 7 Federal Practice and Procedure §1704. In any event, nothing in the majority's opinion suggests that the result would be different under its analysis even if it concluded that only a single case were involved.

### B

There has never been anything like §8772 before. Neither the majority nor respondents have identified another statute that changed the law for a pending case in an outcome-determinative way and explicitly limited its effect to particular judicial proceedings. That fact alone is "[p]erhaps the most telling indication of the severe constitutional problem" with the law. *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. 477, 505 (2010) (internal quotation marks omitted). Congress's "prolonged reticence would be amazing if such interference were not understood to be constitutionally proscribed." *Plaut*, 514 U. S., at 230.

Section 8772 violates the bedrock rule of Article III that the judicial power is vested in the Judicial Branch alone. We first enforced that rule against an Act of Congress during the Reconstruction era in *United States* v. *Klein*, 13 Wall. 128 (1872). *Klein* arose from congressional opposition to conciliation with the South, and in particular to the pardons Presidents Lincoln and Johnson had offered to former Confederate rebels. See *id.,* at 140–141; see, *e.g.,* Presidential Proclamation No. 11, 13 Stat. 737. Although this Court had held that a pardon was proof of loyalty and entitled its holder to compensation in the Court of Claims for property seized by Union forces during the war, see *United States* v. *Padelford*, 9 Wall. 531, 543 (1870), the Radical Republican Congress wished to prevent pardoned rebels from obtaining such compensation. It therefore enacted a law prohibiting claimants from using a pardon as evidence of loyalty, instead requiring the Court of Claims and Supreme Court to dismiss for want of jurisdiction any suit based on a pardon. See Act of July 12, 1870, ch. 251, 16 Stat. 235; see also *United States* v. *Sioux Nation*, 448 U. S. 371, 403 (1980).

Klein's suit was among those Congress wished to block. Klein represented the estate of one V. F. Wilson, a Con-

federate supporter whom Lincoln had pardoned. On behalf of the estate, Klein had obtained a sizable judgment in the Court of Claims for property seized by the Union. *Klein*, 13 Wall., at 132–134. The Government's appeal from that judgment was pending in the Supreme Court when the law targeting such suits took effect. The Government accordingly moved to dismiss the entire proceeding.

This Court, however, denied that motion and instead declared the law unconstitutional. It held that the law "passed the limit which separates the legislative from the judicial power." *Id.*, at 147. The Court acknowledged that Congress may "make exceptions and prescribe regulations to the appellate power," but it refused to sustain the law as an exercise of that authority. *Id.,* at 146. Instead, the Court held that the law violated the separation of powers by attempting to "decide" the case by "prescrib[ing] rules of decision to the Judicial Department of the government in cases pending before it." *Id.,* at 145–146. "It is of vital importance," the Court stressed, that the legislative and judicial powers "be kept distinct." *Id.,* at 147.

The majority characterizes *Klein* as a delphic, puzzling decision whose central holding—that Congress may not prescribe the result in pending cases—cannot be taken at face value.[2] It is true that *Klein* can be read too broadly,

―――――――――

[2] The majority instead seeks to recast *Klein* as being primarily about congressional impairment of the President's pardon power, *ante*, at 14–15, despite *Klein*'s unmistakable indication that the impairment of the pardon power was an *alternative* ground for its holding, secondary to its Article III concerns. 13 Wall., at 147 ("The rule prescribed is *also* liable to just exception as impairing the effect of a pardon, and thus infringing the constitutional power of the Executive." (emphasis added)). The majority then suggests that *Klein* stands simply for the proposition that Congress may not require courts to act unconstitutionally. *Ante*, at 14, and n. 19. That is without doubt a good rule, recognized by this Court since *Marbury* v. *Madison*, 1 Cranch 137 (1803). But it is hard to reconstruct *Klein* along these lines, given its focus on the threat to the

in a way that would swallow the rule that courts generally must apply a retroactively applicable statute to pending cases. See *United States* v. *Schooner Peggy*, 1 Cranch 103, 110 (1801). But *Schooner Peggy* can be read too broadly, too. Applying a retroactive law that says "Smith wins" to the pending case of *Smith* v. *Jones* implicates profound issues of separation of powers, issues not adequately answered by a citation to *Schooner Peggy*. And just because *Klein* did not set forth clear rules defining the limits on Congress's authority to legislate with respect to a pending case does not mean—as the majority seems to think—that Article III itself imposes no such limits.

The same "record of history" that drove the Framers to adopt Article III to implement the separation of powers ought to compel us to give meaning to their design. *Plaut*, 514 U. S., at 218. The nearly two centuries of experience with legislative assumption of judicial power meant that "[t]he Framers were well acquainted with the danger of subjecting the determination of the rights of one person to the tyranny of shifting majorities." *INS* v. *Chadha*, 462 U. S. 919, 961 (1983) (Powell, J., concurring in judgment) (internal quotation marks omitted). Article III vested the judicial power in the Judiciary alone to protect against that threat to liberty. It defined not only what the Judiciary can do, but also what Congress cannot.

The Court says it would reject a law that says "Smith wins" because such a statute "would create no new substantive law." *Ante*, at 12, n. 17. Of course it would: Prior to the passage of the hypothetical statute, the law did not

_____

separation of powers from allowing Congress to manipulate jurisdictional rules to dictate judicial results. See Hart, The Power of Congress To Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic, 66 Harv. L. Rev. 1362, 1373 (1953) ("[I]f Congress directs an Article III court to decide a case, I can easily read into Article III a limitation on the power of Congress to tell the court *how* to decide it . . . as the Court itself made clear long ago in *United States v. Klein*.").

provide that Smith wins. After the passage of the law, it does. Changing the law is simply how Congress acts. The question is whether its action constitutes an exercise of judicial power. Saying Congress "creates new law" in one case but not another simply expresses a conclusion on that issue; it does not supply a reason.

"Smith wins" is a new law, tailored to one case in the same way as §8772 and having the same effect. All that both statutes "effectuat[e]," in substance, is lawmakers' "policy judgment" that one side in one case ought to prevail. *Ante,* at 18. The cause for concern is that though the statutes are indistinguishable, it is plain that the majority recognizes no limit under the separation of powers beyond the prohibition on statutes as brazen as "Smith wins." Hamilton warned that the Judiciary must take "all possible care . . . to defend itself against [the] attacks" of the other branches. The Federalist No. 78, at 466. In the Court's view, however, Article III is but a constitutional Maginot Line, easily circumvented by the simplest maneuver of taking away every defense against Smith's victory, without saying "Smith wins."

Take the majority's acceptance of the District Court's conclusion that §8772 left "plenty" of factual determinations for the court "to adjudicate." *Ante*, at 16–17, and n. 20 (internal quotation marks omitted). All §8772 actually required of the court was two factual determinations—that Bank Markazi has an equitable or beneficial interest in the assets, and that no other party does, §8772(a)(2)—both of which were well established by the time Congress enacted §8772. Not only had the assets at issue been frozen pursuant to an Executive Order blocking "property of the Government of Iran," Exec. Order No. 13599, 77 Fed. Reg. 6659 (2012), but the Bank had "repeatedly insisted that it is the sole beneficial owner of the Blocked Assets," App. to Pet. for Cert. 113a. By that measure of "plenty," the majority would have to uphold a

law directing judgment for Smith if the court finds that Jones was duly served with notice of the proceedings, and that Smith's claim was within the statute of limitations. In reality, the Court's "plenty" is plenty of nothing, and, apparently, nothing is plenty for the Court. See D. Heyward & I. Gershwin, Porgy and Bess: Libretto 28 (1958).

It is true that some of the precedents cited by the majority, *ante,* at 17–19, have allowed Congress to approach the boundary between legislative and judicial power. None, however, involved statutes comparable to §8772. In *Robertson* v. *Seattle Audubon Soc.*, 503 U. S. 429 (1992), for example, the statute at issue referenced particular cases only as a shorthand for describing certain environmental law requirements, *id.,* at 433–435, not to limit the statute's effect to those cases alone. And in *Plaut*, the Court explicitly distinguished the statute before it—which directed courts to reopen final judgments in an entire class of cases—from one that "'single[s] out' any defendant for adverse treatment (or any plaintiff for favorable treatment)." 514 U. S., at 238. *Plaut*, in any event, held the statute before it *invalid*, concluding that it violated Article III based on the same historical understanding of the judicial power outlined above. *Id.,* at 219–225, 240.[3]

I readily concede, without embarrassment, that it can sometimes be difficult to draw the line between legislative and judicial power. That should come as no surprise; Chief Justice Marshall's admonition "that 'it is a *constitution* we are expounding' is especially relevant when the Court is required to give legal sanctions to an underlying principle of the Constitution—that of separation of powers." *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S.

——————

[3] We have also upheld Congress's long practice of settling individual claims involving public rights, such as claims against the Government, through private bills. See generally *Pope* v. *United States*, 323 U. S. 1 (1944). But the Court points to no example of a private bill that retroactively changed the law for a single case involving private rights.

579, 596–597 (1952) (Frankfurter, J., concurring) (quoting *McCulloch* v. *Maryland*, 4 Wheat. 316, 407 (1819)). But however difficult it may be to discern the line between the Legislative and Judicial Branches, the entire constitutional enterprise depends on there *being* such a line. The Court's failure to enforce that boundary in a case as clear as this reduces Article III to a mere "parchment barrier[ ] against the encroaching spirit" of legislative power. The Federalist No. 48, at 308 (J. Madison).

C

Finally, the majority suggests that §8772 is analogous to the Executive's historical power to recognize foreign state sovereign immunity on a case-by-case basis. As discussed above, however, §8772 does considerably more than withdraw the Bank's sovereign immunity. *Supra,* at 7–8. It strips the Bank of any protection that federal common law, international law, or New York State law might have offered against respondents' claims. That is without analogue or precedent. In any event, the practice of applying case-specific Executive submissions on sovereign immunity was not judicial acquiescence in an intrusion on the Judiciary's role. It was instead the result of substantive sovereign immunity law, developed and applied by the courts, which treated such a submission as a dispositive fact. See *Verlinden B. V.* v. *Central Bank of Nigeria,* 461 U. S. 480, 486–487 (1983); *Ex parte Peru,* 318 U. S. 578, 587–588 (1943).

The majority also compares §8772 to the political branches' authority to "exercise[ ] control over claims against foreign states and the disposition of foreign-state property in the United States." *Ante,* at 21 (citing *Dames & Moore* v. *Regan,* 453 U. S. 654 (1981)). In *Dames & Moore*, we considered whether the President had authority to suspend claims against Iran, and to nullify existing court orders attaching Iran's property, in order to fulfill

U. S. obligations under a claims settlement agreement with that country. *Id.*, at 664–667. We held that the President had that power, based on a combination of statutory authorization, congressional acquiescence, and inherent Executive power. See *id.,* at 674–675, 686.

The majority suggests that *Dames & Moore* supports the validity of §8772. But *Dames & Moore* was self-consciously "a restricted railroad ticket, good for this day and train only." *Smith* v. *Allwright*, 321 U. S. 649, 669 (1944) (Roberts, J., dissenting). The Court stressed in *Dames & Moore* that it "attempt[ed] to lay down no general 'guidelines' covering other situations not involved here, and attempt[ed] to confine the opinion only to the very questions necessary to [the] decision of the case." 453 U. S., at 661; see also *American Ins. Assn.* v. *Garamendi*, 539 U. S. 396, 438 (2003) (GINSBURG, J., dissenting) ("Notably, the Court in *Dames & Moore* was emphatic about the 'narrowness' of its decision.").

There are, moreover, several important differences between *Dames & Moore* and this case. For starters, the executive action *Dames & Moore* upheld did not dictate how particular claims were to be resolved, but simply required such claims to be submitted to a different tribunal. 453 U. S., at 660. Furthermore, *Dames & Moore* sanctioned that action based on the political branches' "longstanding" practice of "settl[ing] the claims of [U. S.] nationals against foreign countries" by treaty or executive agreement. *Id.*, at 679. The Court emphasized that throughout our history, the political branches have at times "disposed of the claims of [U. S.] citizens without their consent, or even without consultation with them," by renouncing claims, settling them, or establishing arbitration proceedings. *Id.*, at 679–681 (internal quotation marks omitted). Those dispositions, crucially, were not exercises of judicial power, as is evident from the fact that the Judiciary lacks authority to order settlement or estab-

lish new tribunals. That is why *Klein* was not at issue in *Dames & Moore.* By contrast, no comparable history sustains Congress's action here, which seeks to provide relief to respondents not by transferring their claims in a manner only the political branches could do, but by commandeering the courts to make a political judgment look like a judicial one. See *Medellín* v. *Texas*, 552 U. S. 491, 531 (2008) (refusing to extend the President's claims-settlement authority beyond the "narrow set of circumstances" defined by the "'systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned'" (quoting *Dames & Moore*, 453 U. S., at 686)).

If anything, what *Dames & Moore* reveals is that the political branches have extensive powers of their own in this area and could have chosen to exercise them to give relief to the claimants in this case. Cf. 50 U. S. C. §1702(a)(1)(C) (authorizing the President, in certain emergency circumstances, to confiscate and dispose of foreign sovereign property). The authority of the political branches is sufficient; they have no need to seize ours.

\*    \*    \*

At issue here is a basic principle, not a technical rule. Section 8772 decides this case no less certainly than if Congress had directed entry of judgment for respondents. As a result, the potential of the decision today "to effect important change in the equilibrium of power" is "immediately evident." *Morrison* v. *Olson*, 487 U. S. 654, 699 (1988) (Scalia, J., dissenting). Hereafter, with this Court's seal of approval, Congress can unabashedly pick the winners and losers in particular pending cases. Today's decision will indeed become a "blueprint for extensive expansion of the legislative power" at the Judiciary's expense, *Metropolitan Washington Airports Authority* v. *Citizens for Abatement of Aircraft Noise, Inc.*, 501 U. S. 252, 277

(1991), feeding Congress's tendency to "extend[ ] the sphere of its activity and draw[ ] all power into its impetuous vortex," The Federalist No. 48, at 309 (J. Madison).

I respectfully dissent.