**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MICHAEL BENNETT; LINDA BENNETT, as Co-Administrators of the Estate of Maria Ann Bennett, *Plaintiffs-Appellees*, | Nos. 13-15442 13-16100 |
| v. | D.C. No. 3:11-cv-05807-CRB |
| THE ISLAMIC REPUBLIC OF IRAN, *Defendant*, | |
| v. | ORDER AND AMENDED OPINION |
| VISA INC.; FRANKLIN RESOURCES, INC., *Defendants-third-party-plaintiffs–Appellees*, | |
| v. | |
| GREENBERG AND ACOSTA JUDGEMENT CREDITORS, *Plaintiff-third-party-defendant–Appellee*, | |
| HEISER JUDGMENT CREDITORS, *Plaintiff-fourth-party-defendant–Appellee*, | |
| v. | |

BANK MELLI,

*Plaintiff-third-party-
defendant–Appellant.*

Appeals from the United States District Court
for the Northern District of California
Charles R. Breyer, Senior District Judge, Presiding

Argued and Submitted
April 15, 2015—San Francisco, California

Filed February 22, 2016
Amended June 14, 2016

Before: Sidney R. Thomas,[*] and Susan P. Graber, Circuit
Judges, and Dee V. Benson,[**] Senior District Judge.

Order;
Opinion by Judge Graber;
Partial Concurrence and Partial Dissent by Judge Benson

---

[*] Chief Judge Thomas was drawn to replace Judge Kozinski. He has
read the briefs, reviewed the record, and listened to the audio-recording of
oral argument held on April 15, 2015.

[**] The Honorable Dee V. Benson, Senior District Judge for the U.S.
District Court for the District of Utah, sitting by designation.

## SUMMARY[***]

### Foreign Sovereign Immunity

The panel filed (1) an order amending its opinion and partial dissent filed February 22, 2016, and denying petitions for panel rehearing and rehearing en banc; and (2) an amended opinion and partial dissent.

In its amended opinion, the panel affirmed the district court's denial of the motion of Bank Melli, the national bank of the Islamic Republic of Iran, to dismiss claims filed against it in an interpleader complaint seeking a determination of the rights to blocked Iranian assets held by other parties but owed to Bank Melli. Judgment creditors of Iran sought access to the assets in order to collect on unsatisfied judgments for deaths and injuries suffered in terrorist attacks sponsored by Iran.

The panel held that the Terrorism Risk Insurance Act permits judgment creditors to attach assets held by the instrumentalities of state sponsors of terrorism. Accordingly, the blocked assets of Bank Melli that were at issue in this case could be attached. Agreeing with the Seventh Circuit, the panel held that § 1610(g) of the Foreign Sovereign Immunities Act also permitted attachment. The panel held that these statutes did not impermissibly impose retroactive liability even though the terrorist acts underlying the judgments occurred before enactment of the statutes.

[***] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel also held that under California law, the assets were property of Bank Melli.  In addition, because Bank Melli did not enjoy sovereign immunity, and could be joined in the action, Federal Rule of Civil Procedure 19 did not require dismissal of the claims against Bank Melli.

District Judge Benson concurred with the majority that § 201(a) of the Terrorism Risk Insurance Act and § 1610 of the Foreign Sovereign Immunities Act permitted the judgment creditors to attach and execute against monies owed to Bank Melli.  Judge Benson dissented from the holding that § 1610(g) is a freestanding immunity exception.  He stated that in his view, the judgment creditors could proceed because they had sufficiently alleged that Bank Melli was engaged in commerce in the United States within the meaning of the exception to attachment immunity set forth in § 1610(b)(3).

**COUNSEL**

Jeffrey A. Lamken, Robert K. Kry (argued) and Lucas M. Walker, MoloLamken LLP, Washington D.C., for Appellant.

Curtis C. Mechling (argued), Benjamin Weathers-Lowin, and Patrick N. Petrocelli, Stroock & Stroock & Lavan LLP, New York, New York; Dale K. Cathell and Richard M. Kremen, DLA Piper LLP, Baltimore, Maryland; Jane Carol Norman and Thomas Fortune Fay, Bond & Norman, Washington, D.C., for Judgment Plaintiffs-Appellees.

Benjamin T. Peele, III (argued), Baker & McKenzie LLP, Washington, D.C.; Bruce H. Jackson, Baker & McKenzie LLP, San Francisco, California, for Appellees Visa, Inc. and Franklin Resources, Inc.

---

**ORDER**

The opinion and partial dissent filed February 22, 2016, and reported at 817 F.3d 1131, are amended by the opinion and partial dissent filed concurrently with this order.

With these amendments, Judges Thomas and Graber have voted to deny Appellant's petition for panel rehearing and petition for rehearing en banc. Judge Benson has voted to grant the petition for panel rehearing and has recommended granting the petition for rehearing en banc.

The full court has been advised of the petition for rehearing en banc, and no judge of the court has requested a vote on it.

Appellant's petition for panel rehearing and petition for rehearing en banc are **DENIED**. No further petitions for panel rehearing or for rehearing en banc may be filed.

---

**OPINION**

GRABER, Circuit Judge:

Approximately 90 United States citizens (or the representatives of their estates) are attempting to collect on unsatisfied money judgments that they hold against the Islamic Republic of Iran for deaths and injuries suffered in terrorist attacks sponsored by Iran. The assets that are the subject of this interpleader action are monies contractually owed to Bank Melli by Visa Inc. and Franklin Resources Inc. ("Franklin"). Bank Melli is an instrumentality of Iran. It asserts that Plaintiffs cannot execute on the assets (1) because Bank Melli enjoys sovereign immunity under the Foreign Sovereign Immunities Act of 1976 ("FSIA"), (2) because the relevant statutory exceptions to sovereign immunity may not be applied retroactively, (3) because the blocked assets are not property of Bank Melli, and (4) because Bank Melli is a required party that cannot be joined, thus requiring dismissal under Federal Rule of Civil Procedure 19. We disagree and, accordingly, affirm the judgment of the district court.

BACKGROUND LEGAL PRINCIPLES

The jurisdiction of the United States over persons and property within its territory "is susceptible of no limitation not imposed by itself." *Schooner Exch. v. McFaddon*, 11 U.S. (7 Cranch) 116, 136 (1812). Accordingly, foreign

sovereign immunity is "a matter of grace and comity rather than a constitutional requirement." *Republic of Austria v. Altmann*, 541 U.S. 677, 689 (2004). Courts consistently "defer[] to the decisions of the political branches" on whether to take actions against foreign sovereigns and their instrumentalities. *Id.* (quoting *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486 (1983)).

The FSIA, 28 U.S.C. §§ 1330, 1602–1611, establishes a default rule that foreign states are immune from suit in United States courts. *Id.* § 1604. Congress enacted the statute to provide a "comprehensive . . . 'set of legal standards governing claims of immunity in every civil action against a foreign state or its political subdivisions, agencies, or instrumentalities.'" *Altmann*, 541 U.S. at 691 (quoting *Verlinden B.V.*, 461 U.S. at 488). The FSIA provides the exclusive vehicle for subject matter jurisdiction in all civil actions against foreign state defendants. *Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1317 n.1 (2016); *OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390, 393 (2015); *Flatow v. Islamic Republic of Iran*, 308 F.3d 1065, 1069 (9th Cir. 2002).

The FSIA includes many exceptions to its general rule of immunity. 28 U.S.C. §§ 1605–1607. Relevant here, in 1996, Congress added a new exception, stripping a foreign state of its sovereign immunity when (1) the United States officially designates the foreign state a state sponsor of terrorism and (2) the foreign state is sued "for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act." *Id.* § 1605A.

Iran was designated a terrorist party pursuant to section 6(j) of the Export Administration Act of 1979, 50 U.S.C. app. § 2405(j) (effective Jan. 19, 1984). *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1123 (9th Cir. 2010); *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 48 (2d Cir. 2010). That designation means that Iran is not entitled to sovereign immunity for claims under § 1605A.

Separately, the FSIA addresses the immunity of sovereign property from execution and attachment. Subject to enumerated exceptions, a foreign state's property in the United States is immune from attachment and execution. 28 U.S.C. § 1609.

In *First National City Bank v. Banco Para el Comercio Exterior de Cuba* ("*Bancec*"), 462 U.S. 611, 620–21 (1983), the Supreme Court concluded that the FSIA did *not* control whether and to what extent *instrumentalities* could be held liable for the debts of their sovereigns. Applying international law and federal common law, the Court held that "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such." *Id.* at 626–27. That rule, referred to as the "*Bancec* presumption," may be overcome only in limited circumstances. *Id.* at 628–34. The federal courts later described five "*Bancec* factors" that may be considered in determining whether the presumption has been overcome in any given case. *E.g., Flatow*, 308 F.3d at 1071 n.9.[1]

---

[1] The five factors are:

> (1) the level of economic control by the government;
> (2) whether the entity's profits go to the government;

Even after Congress added § 1605(a)(7) (now § 1605A) to the FSIA in 1996, successful plaintiffs struggled to enforce judgments against Iran when they were harmed by its terrorist activities. *See, e.g.*, *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 49–58 (D.D.C. 2009) (describing "The Never-Ending Struggle to Enforce Judgments Against Iran"). Once again, Congress responded by enacting new statutes, this time designed to facilitate the satisfaction of such judgments by expanding successful plaintiffs' ability to attach and execute on the property of agencies and instrumentalities of terrorist states. *Bank Markazi*, 136 S. Ct. at 1318.

First, in 2002, Congress enacted the Terrorism Risk Insurance Act of 2002 ("TRIA"), Pub. L. No. 107-297, 116 Stat. 2322. Section 201(a) of the TRIA provides:

> Notwithstanding any other provision of law, and except as provided in subsection (b) [of this note, pertaining to Presidential waiver], in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune

---

(3) the degree to which government officials manage the entity or otherwise have a hand in its daily affairs; (4) whether the government is the real beneficiary of the entity's conduct; and (5) whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations.

*Flatow*, 308 F.3d at 1071 n.9 (quoting *Walter Fuller Aircraft Sales, Inc. v. Republic of the Philippines*, 965 F.2d 1375, 1380 n.7 (5th Cir. 1992)).

under section 1605A or 1605(a)(7) . . . , the blocked assets[2] of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA § 201(a) was codified as a statutory note to 28 U.S.C. § 1610 on "Treatment of Terrorist Assets."

Second, in 2008, Congress amended the FSIA as part of the National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338. Among other changes, Congress added a new subsection to the FSIA, which provides in part that

the property of a foreign state against which a judgment is entered under section 1605A, and the property of an agency or instrumentality of such a state, including property that is a separate juridical entity or is an interest held directly or indirectly in a separate juridical entity, is subject to attachment in aid of execution, and execution, upon that judgment as provided in this section, regardless of [the

---

[2] "Blocked assets" refers to "any asset seized by the Executive Branch pursuant to either the Trading With the Enemy Act or the International Emergency Economic Powers Act. *See* TRIA § 201(d)(2)." *Bank Markazi*, 135 S. Ct. at 1318 (citations omitted).

> same five factors described by the federal
> courts as the "*Bancec* factors"].

28 U.S.C. § 1610(g)(1); *see also Bank Markazi*, 136 S. Ct. at 1318 n.2.  For ease of reference, we refer to this section as "FSIA § 1610(g)."

## FACTUAL AND PROCEDURAL HISTORY

Four groups of individuals sued the Islamic Republic of Iran for damages arising from deaths and injuries suffered in terrorist attacks sponsored by Iran; in each case, a final money judgment was entered in favor of the plaintiffs and against Iran.  In *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20 (D.D.C. 2009), and *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006), the plaintiffs secured judgments for more than $590 million for the 1996 bombing of the Khobar Towers in Saudi Arabia.  In *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15 (D.D.C. 2008), the plaintiffs received a judgment of more than $350 million because of a 1990 mass shooting.  In *Bennett v. Islamic Republic of Iran*, 507 F. Supp. 2d 117 (D.D.C. 2007), the plaintiffs obtained a judgment for damages of nearly $13 million for Iran's role in the 2002 bombing of a cafeteria at Hebrew University in Jerusalem.  And in *Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90 (D.D.C. 2006), the plaintiffs were awarded almost $20 million for damages suffered as a result of the bombing of a Jerusalem restaurant in 2001.  Collectively, the judgments total nearly $1 billion.  Although all the judgments were taken by default, it is undisputed that all are valid final judgments and that Iran owes the amounts of those judgments to the respective plaintiffs.

Bank Melli, Iran's largest financial institution, is wholly owned by the government of Iran. It is undisputed that Bank Melli qualifies as an instrumentality of Iran under the FSIA. Bank Melli was not named as a defendant in any of the four cases described above and was not itself alleged to have been involved in the underlying terrorist events. On October 25, 2007, the United States Department of the Treasury, Office of Foreign Assets Control exercised its authority under Executive Order No. 13,382, 70 Fed. Reg. 38,567 (June 28, 2005), to block Bank Melli's assets in the United States because of its involvement in Iran's nuclear and missile industries. Bank Melli's assets also are blocked pursuant to a 2012 Executive Order blocking the property of Iran and of Iranian financial institutions. Exec. Order No. 13,599, 77 Fed. Reg. 6659 (Feb. 8, 2012).[3]

Visa and Franklin owe about $17.6 million to Bank Melli pursuant to a commercial relationship that involves the use of Visa credit cards in Iran. Visa and Franklin have not turned the funds over to Bank Melli only because the funds are blocked. The *Bennett* judgment creditors filed a complaint against Visa and Franklin, seeking to attach and execute against the blocked assets. Visa and Franklin responded by initiating this interpleader action, naming as defendants Bank Melli and the three other sets of judgment creditors. Visa and Franklin sought a determination of the rights to the blocked assets in their possession and a discharge of Visa and Franklin with regard to those assets. After Bank Melli entered its appearance, it moved to dismiss the action.

---

[3] The recent lifting of a portion of the sanctions imposed on Iran does not render this interpleader action moot, nor does it affect our analysis of the issues raised here.

Bank Melli made four arguments for dismissal, each of which the district court rejected.  The court held:  (1) TRIA § 201(a) and FSIA § 1610(g) enable the judgment creditors to attach the monies owed to Bank Melli; (2) TRIA § 201(a) and FSIA § 1610(g) do not impose retroactive liability; (3) the blocked assets constitute property of Bank Melli; and (4) Bank Melli was not a required party under Federal Rule of Civil Procedure 19.  *Bennett v. Islamic Republic of Iran*, 927 F. Supp. 2d 833 (N.D. Cal. 2013).  The district court denied the motion to dismiss and certified the order for interlocutory appeal under 28 U.S.C. § 1292(b).  *Bennett*, 927 F. Supp. 2d at 845–46.

## STANDARD OF REVIEW

We review de novo:  questions of statutory construction, *Miranda v. Anchondo*, 684 F.3d 844, 849 (9th Cir. 2012); a district court's ruling on a motion to dismiss for failure to state a claim or for lack of subject matter jurisdiction, *Colony Cove Props., LLC v. City of Carson*, 640 F.3d 948, 955 (9th Cir. 2011); the question whether a statute may be applied retroactively, *Scott v. Boos*, 215 F.3d 940, 942 (9th Cir. 2000); and legal determinations underlying a district court's decision whether an action can proceed in the absence of a required party under Rule 19, *Kescoli v. Babbitt*, 101 F.3d 1304, 1309 (9th Cir. 1996).

DISCUSSION

A. *TRIA § 201(a) and FSIA § 1610(g) permit attachment and execution of the monies owed to Bank Melli.*

1. *TRIA § 201(a)*

We hold that TRIA § 201(a) permits judgment creditors to attach assets held by the instrumentalities of state sponsors of terrorism. As always, when interpreting a statute, we begin with its text. *Metro One Telecomms., Inc. v. Comm'r*, 704 F.3d 1057, 1061 (9th Cir. 2012). Section 201(a) of the TRIA applies "[n]otwithstanding *any* other provision of law," "in *every* case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605A or 1605(a)(7)," and "in order to satisfy such judgment to the extent of *any* compensatory damages for which such terrorist party has been adjudged liable." TRIA § 201(a) (emphases added). The statute provides that, in cases such as this one, "the blocked assets of [the] terrorist party (including the blocked assets of *any* agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution." *Id.* (emphasis added). This wording demonstrates that Congress knew that the blocked assets of an instrumentality might otherwise have been excluded from the phrase "blocked assets of [the] terrorist party" and that Congress acted to ensure that, instead, the instrumentality's blocked assets were included. *Cf. Alejandre v. Telefonica Larga Distancia de P.R., Inc.*, 183 F.3d 1277, 1287, 1288 n.25 (11th Cir. 1999) (stating that a proposed amendment to the FSIA that would have applied to property that "belongs to an *agency or instrumentality* of a foreign state" demonstrated that Congress "knows how to

express clearly an intent to make instrumentalities substantively liable for the debts of their related foreign governments" (internal quotation marks omitted)). Accordingly, we agree with the Second Circuit when it held that it is "clear beyond cavil that Section 201(a) of the TRIA provides courts with subject matter jurisdiction over post-judgment execution and attachment proceedings against property held in the hands of an instrumentality of the judgment-debtor, even if the instrumentality is not itself named in the judgment." *Weinstein*, 609 F.3d at 50.

Bank Melli disputes this reading of § 201(a), arguing instead that it applies only to instrumentalities that are alter egos of the state; that is, Bank Melli argues that the *Bancec* presumption against the attachment of assets held by state instrumentalities applies. Bank Melli reasons that, because "including" is a term of illustration, the words that follow are merely an example of the main preceding principle. That observation is true but is of no assistance to Bank Melli. By listing "the blocked assets of any . . . instrumentality of that terrorist party" as a specific example of assets that are "subject to execution or attachment . . . in order to satisfy" a money judgment obtained under § 1605A or § 1605(a)(7), Congress clearly instructed courts to allow the instrumentality's blocked assets to be reached. Congress also instructed courts to allow these assets to be reached "[n]otwithstanding any other provision of law"—that is, regardless of the usual fiction embodied in *Bancec*. Congress purposely overrode the *Bancec* presumption in this context and abrogated attachment immunity with respect to the blocked assets of instrumentalities of designated state sponsors of terrorism. Section 201(a) permits the judgment creditors to attach the assets of an instrumentality of a state

sponsor of terrorism.  Accordingly, the blocked assets of Bank Melli that are at issue in this case may be attached.

### 2.  *FSIA § 1610(g)*

FSIA § 1610(g) allows attachment of and execution against property held by a foreign terrorist state's instrumentality "that is a separate juridical entity," "regardless of" five factors.  As noted above, those enumerated factors are the same five factors identified by the federal courts as the "*Bancec* factors" that may be used to decide whether an instrumentality is an alter ego under *Bancec*.  *E.g.*, *Flatow*, 308 F.3d at 1071–72, 1071 n.9.  It is clear from the text of the statute that Congress was referring to, and abrogating, not just the presumption of separate juridical status, but also *Bancec* specifically.  Therefore, § 1610(g) also permits attachment in this case.

But Bank Melli contends that, because § 1610(g) makes assets subject to attachment and execution only "as provided in this section," it is not an independent exception to the immunity granted by 28 U.S.C. § 1609.  Bank Melli reasons that subsection (g) applies only if some other part of § 1610 provides for attachment and execution.  Bank Melli argues that its assets cannot be attached or executed upon because the assets at issue in this case were not "used for a commercial activity in the United States," a requirement in § 1610(a), and Bank Melli has not itself "engaged in commercial activity in the United States," a requirement in § 1610(b).  We are not persuaded.

We hold that subsection (g) contains a freestanding provision for attaching and executing against assets of a foreign state or its agencies or instrumentalities. Subsection (g) covers a different subject than § 1610(a) through (e): by its express terms, it applies *only* to "certain actions," specifically, judgments "entered *under section 1605A*." (Emphasis added.)  In turn, § 1605A revokes sovereign immunity for damages claims against a foreign state for personal injury or death caused by "torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support" for such an act.  By definition, such claims do not arise from commercial activity; they arise from acts of torture (and the like).  Section 1610(g) requires only that a judgment under § 1605A have been rendered against the foreign state; in that event, both the property of the foreign state *and* the property of an agency or instrumentality of that state are subject to attachment and execution.  *See Peterson*, 627 F.3d at 1123 n.2 (stating that § 1610(g) "expanded the category of foreign sovereign property that can be attached; judgment creditors can now reach any U.S. property in which Iran has any interest, whereas before they could reach only property belonging to Iran").  To the extent that subsection (g) is inconsistent with subsection (a) or (b), subsection (g) governs because the particular (judgments entered under § 1605A) controls over the general (all judgments entered after a certain date).  *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384–85 (1992).

When subsection (g) refers to attachment and execution of the judgment "as provided in this section," it is referring to

procedures contained in § 1610(f).**⁴**  Section 1610(f), like § 1610(g), relates to judgments obtained under § 1605A and its predecessor, § 1605(a)(7).  Subsection (f)(1)(A) permits attachment and execution of property that might otherwise be blocked; subsection (f)(1)(B) prohibits attachment or execution against property of a foreign state that it expropriated from a natural person; and subsection (f)(2)(A) provides that the Secretary of State and Secretary of Treasury will make every effort to assist a court or creditor in locating property awarded pursuant to § 1605A.  In light of Congress' mandate to the executive branch to assist in the collection of judgments in such cases, 28 U.S.C. § 1610(f), we cannot impute to Congress an empty statutory gesture.  *See Gates v. Syrian Arab Republic*, 755 F.3d 568, 576 (7th Cir. 2014) (stating that Congress intended the 2008 amendments to the FSIA "to make it easier for terrorism victims to obtain judgments and to attach assets").**⁵**  Given both the text of the

---

**⁴** When Congress enacted subsection (g), subsection (f) already was in place.  Subsection (g) was added to the statute in 2008.  Pub. L. No. 110-181, div. A, tit. X, § 1083(b)(3), 122 Stat. 3, 341 (2008).  Subsection (f) was enacted in 1998.  Pub. L. No. 105-277, § 101(h), 112 Stat. 2681-491 (1998).

**⁵** In its Petition for Rehearing or Rehearing En Banc, Bank Melli argues that our reading of the statute must be wrong because, in 2000, President Clinton waived the enforcement of § 1610(f)(1); it reasons that "as provided in this section" therefore cannot refer to § 1610(f).  That argument fails for at least three reasons.  *First*, only subsection (f)(1) is not being enforced.  Pres. Determ. No. 2001-03, 65 Fed. Reg. 66,483 (Oct. 28, 2000).  Several other parts of subsection (f)—described in text—have always remained fully enforced, so subsection (g) refers, at a minimum, to the enforced portions.  *Second*, our search is only for congressional intent when subsection (g) was enacted.  A partial waiver does not reflect congressional intent; if anything, it demonstrates presidential disagreement with congressional intent.  And non-enforcement by the executive branch does not equal repeal by Congress; regardless of the partial waiver, all of

statute and Congress' intention to make it easier for victims of terrorism to recover judgments, we hold that § 1610(g) is a freestanding provision for attaching and executing against assets to satisfy a money judgment premised on a foreign state's act of terrorism.

Bank Melli argues, and our colleague agrees, that our reading of § 1610(g) renders § 1610(a)(7) and (b)(3) superfluous.[6] But the tension works in the opposite direction. If § 1610(g) is interpreted to require that, to be subject to attachment and execution, property must be used by the foreign state for a "commercial activity," § 1610(a), or that the instrumentality must be "engaged in commercial activity in the United States," § 1610(b), then we would have to read into § 1610(g) a limitation that Congress did not insert. *See United States v. Temple*, 105 U.S. (9 Otto) 97, 99 (1881) (holding that the court has "no right to insert words and phrases, so as to incorporate in the statute a new and distinct provision"). Section 1610(g)(1) provides that "*the property of a foreign state* against which a judgment is entered under

---

subsection (f) remains the law. *Third*, the blinders-on, technical focus of this argument loses sight of Congress' main aim, which is for private plaintiffs who suffered torture and obtained tort judgments to get their money from terrorist states.

[6] Our colleague gives two other reasons for disagreeing with us on this point. The first is that § 1610(b)(3) does not require property "to be involved in terrorism to abrogate attachment immunity." Partial dissent at 36. We do not suggest to the contrary. The other reason is that it would be "an unjustified and unfortunate result," *id.* at 38, to allow attachment and execution of non-commercial property, such as museum artifacts belonging to Iran. But it is not our province to decide whether the policy choices embodied in a statute are wise or unwise; our task is, rather, to discern congressional intent. *Day-Brite Lighting, Inc. v. Missouri*, 342 U.S. 421, 423 (1952).

section 1605A, and *the property of an agency or instrumentality* of such a state, . . . is subject to attachment in aid of execution, and execution." (Emphases added.) Thus, Congress did not limit the type of property subject to attachment and execution under § 1610(g) to property connected to commercial activity in the United States. The only requirement is that property be "the property of" the foreign state or its instrumentality.

Two Seventh Circuit cases support our conclusion in this regard. In *Wyatt v. Syrian Arab Republic*, 800 F.3d 331, 343 (7th Cir. 2015), *cert. denied*, 136 S. Ct. 1721 (2016), the court held that the plaintiffs need not comply with § 1608(e) when proceeding under § 1610(g). The court noted that § 1608(e) is part of a "more general process" applicable to "suits other than those for state-sponsored terrorism, such as more ordinary contract or tort cases arising out of a foreign state's commercial activities." *Id.* at 333. Section 1610(g), the court noted, "contains provisions specific to claims for state-sponsored terrorism." *Id.* Those specific provisions allow plaintiffs with a judgment against a state sponsor of terrorism, obtained pursuant to § 1605A, to attach and execute the judgment against property of the foreign state and against property of any agency and instrumentality of the state. *Id.* The other provisions of § 1610, contained in subsections (a) through (c), establish a general process for judgments against a foreign state not necessarily resting on state-sponsored terrorism. *Id.*

Similarly, the court held in *Gates* that a plaintiff proceeding under § 1610(g) need not comply with § 1610(c). The court wrote in part:

> Sections 1610(a) and (b) are available to satisfy a wide variety of judgments, but they allow attachment of only specific categories of assets to satisfy those judgments. *See, e.g.*, § 1610(a) (allowing attachment of foreign state property located in the United States and used for commercial activity there); § 1610(b) (allowing attachment of property of foreign state agency or instrumentality engaged in United States commercial activity).
>
> By contrast, § 1610(g) is available only to holders of judgments under the § 1605A exception for state-sponsored terrorism, but it allows attachment of a much broader range of assets to satisfy those judgments.

*Gates*, 755 F.3d at 576.

Regardless of canons of construction—such as the principle that a specific statute takes precedence over a general one—our ultimate search is for congressional intent. *Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001). And it is quite clear that Congress meant to expand successful plaintiffs' options for collecting judgments against state sponsors of terrorism.

We acknowledge that § 1610 as a whole is ambiguous.[7] In that circumstance, we may consider legislative history. *Id.* at 91–92; *United States v. Pub. Utils. Comm'n*, 345 U.S. 295, 315 (1953). That history suggests that § 1610(g) was meant to allow attachment and execution with respect to any property whatsoever of the foreign state or its instrumentality. Senator Lautenberg, one of the sponsors of the bill that became § 1610(g), stated that the provision would "allow[] attachment of the assets of a state sponsor of terrorism to be made upon the satisfaction of a 'simple ownership' test." 154 Cong. Rec. S54-01 (Jan. 22, 2008) (statement of Sen. Lautenberg). The House Conference Report for a substantially similar earlier version of the bill noted that the provision "would . . . expand the ability of claimants to seek recourse against the property of that foreign state," in part "by permitting any property in which the foreign state has a beneficial ownership to be subject to execution of that

---

[7] We also acknowledge that the United States, appearing as amicus curiae, disagrees with our interpretation. We are not required to defer to the government's view because, in deciding this case, we "are not being asked to supplant a foreign policy decision of the political branches with the courts' own unmoored determination." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 132 S. Ct. 1421, 1427 (2012). To the contrary, the executive branch has approved the building blocks of the statutory criteria for execution on the property in question, which we are applying in a routine exercise of statutory interpretation: The President signed the legislation that became § 1610(g), Pub. L. No. 110-181, President Bush Signs the National Defense Authorization Act for Fiscal Year 2008, 2008 U.S.C.C.A.N. S3 (Jan. 28, 2008); the President has not sought to waive enforcement as was done with respect to § 1610(f)(1); the Secretary of State listed Iran as a terrorist state, 49 Fed. Reg. 2836-02 (Jan. 23, 1984); and the President imposed monetary sanctions on Iran, Exec. Order No. 13,599, 77 Fed. Reg. 6659 (Feb. 5, 2012). And, finally, in "[e]nacting the FSIA in 1976, Congress transferred from the Executive to the courts the principal responsibility for determining a foreign state's amenability to suit." *Bank Markazi*, 136 S. Ct. at 1329.

judgment." H.R. Rep. No. 11-447, at 1001 (2007) (Conf. Rep.). The bill, it continued, "is written to subject any property interest in which the foreign state enjoys a beneficial ownership to attachment and execution." *Id.* We have already noted that the basic purpose of adding § 1610(g) was to enable plaintiffs who have established a foreign state's liability under § 1605A and its predecessor, for terrorist acts, to collect on their judgments. As Senator Lautenberg put it, the bill was meant "to facilitate victims' collection of their damages from state sponsors of terrorism." 154 Cong. Rec. S54-01 (Jan. 22, 2008) (statement of Sen. Lautenberg). Our interpretation of § 1610(g) more fully furthers that fundamental aim.

Bank Melli also makes three other arguments regarding § 1610(g). We can dispose of those arguments easily.

(1) The district court's failure to discuss expressly whether to grant Bank Melli discretionary relief under the "innocent party" provision of § 1610(g)(3) does not mean that the court failed to consider whether that provision applied. Bank Melli made its § 1610(g)(3) argument to the district court, and we presume that the court understood its authority but declined to exercise discretion in Bank Melli's favor. *Cf. United States v. Davis*, 264 F.3d 813, 816–17 (9th Cir. 2001) (so holding in the context of a district court's silence regarding a requested downward departure under the United States Sentencing Guidelines).

(2) There is no conflict between § 1610(g) and the 1955 Treaty of Amity between the United States and Iran, which requires that the United States respect the juridical status of Iranian companies, protect their property in accordance with international law, and not discriminate against them. Treaty

of Amity, Economic Relations and Consular Rights Between the United States of America and Iran, Aug. 15, 1955, 8 U.S.T. 899, 902–03. As the Second Circuit held, that treaty provision is intended simply to ensure that foreign corporations are on equal footing with domestic corporations. *Weinstein*, 609 F.3d at 53. Even if the two provisions were inconsistent, when a treaty and a later-enacted federal statute conflict, the subsequent statute controls to the extent of the conflict. *Breard v. Greene*, 523 U.S. 371, 376 (1998) (per curiam).

(3) Allowing the Heiser plaintiffs to obtain relief under § 1610(g) by converting their § 1605(a)(7) judgment to a § 1605A judgment does not violate separation of powers principles. Bank Melli's reliance on *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 219 (1995), is misplaced. There, the court held that Congress could not require federal courts to reopen final judgments. But here, the judgment was not reopened. Instead, the Heiser plaintiffs have a new collection tool; they can enforce their final judgment against Iran by attaching and executing on the property of Iran's instrumentality. In essence, the statute gives *more* effect to the final judgment, rather than attempting to revise or rescind that judgment.

B. *The statutes do not impermissibly impose retroactive liability*.

Bank Melli next argues that the judgment creditors cannot use TRIA § 201(a) or FSIA § 1610(g) because the terrorist acts that underlie the judgments occurred before the enactment of those statutes. The general default rule is that a law that increases substantive liability for past conduct does

not operate retroactively. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994).

But the statutes do not impose new liability on Iran. Section 1605(a)(7) was in effect at the time of the terrorist acts in question. Rather, the statutes simply permit additional methods of collection. *See id.* at 275 (noting that the default rule does not apply to rules of procedure because of "diminished reliance interests").

Even if TRIA § 201(a) and FSIA § 1610(g) are viewed as imposing new liability retroactively, the default rule is different for statutes that govern foreign sovereign immunity. In *Altmann*, 541 U.S. at 692, the Supreme Court concluded that the *Landgraf* presumption does not apply to such statutes. To the contrary, when it comes to sovereign immunity for both foreign states and their agencies and instrumentalities, there is a presumption in *favor* of retroactivity "absent contraindications" from Congress. *Id.* at 696.

Here, there are no such contraindications. In fact, the opposite is true. The purpose of the statutes at issue was to enable not just future litigants, but also current judgment creditors to collect on the final judgments that they already held—which, as a matter of logic, arose from past acts. Congress chose to make TRIA § 201(a) applicable in "*every* case in which a person *has obtained* a judgment" under either the former statute, § 1605(a)(7), or the current statute, § 1605A. TRIA § 201(a) (emphases added). Similarly, Congress chose to make § 1610(g) applicable to all judgments entered under § 1605A. Accordingly, these statutes apply even if they are seen as imposing liability retroactively, because Congress so intended.

C.  *The blocked assets are property of Bank Melli.*

Bank Melli also contends that TRIA § 201(a) and FSIA § 1610(g) do not permit attachment of the assets here because Visa and Franklin own the blocked assets; Bank Melli does not.  Under TRIA § 201(a), to be subject to execution or attachment, the blocked assets must be "assets of" the instrumentality.  Similarly, § 1610(g) applies to "the property of" the instrumentality.

Like most courts, we look to state law to determine the ownership of assets in this context.  *Peterson*, 627 F.3d at 1130–31; *see also Calderon-Cardona v. Bank of N.Y. Mellon*, 770 F.3d 993, 1000–01 (2d Cir. 2014) (looking to New York law to determine what type of interest rendered property attachable under § 1610(g)), *cert. denied*, 136 S. Ct. 893 (2016); *Walker Int'l Holdings, Ltd. v. Republic of Congo*, 415 F.3d 413, 415 (5th Cir. 2005) (applying Texas law to determine attorney fees award in FSIA action); *Hegna v. Islamic Republic of Iran*, 380 F.3d 1000, 1007 (7th Cir. 2004) (applying Illinois law to decide whether property interest was open to challenge in action under FSIA); *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara ("Pertamina")*, 313 F.3d 70, 83 (2d Cir. 2002) (applying New York law to determine what actions are subject to enforcement and available to judgment creditors).  Here, California law applies.  As we held in *Peterson*, California law authorizes a court to order a judgment debtor to assign to the judgment creditor a right to payments that are due or will become due, even if the right is conditioned on future developments.  627 F.3d at 1130–31; Cal. Civ. Proc. Code § 482.080(a)(2) (providing that a court may order a defendant subject to a writ of attachment to turn over either "evidence of title to property of or a debt owed to the defendant"); *id.*

§ 680.310 ("'Property' includes real and personal property and any interest therein."); *id.* § 708.210 (permitting a judgment creditor to bring an action against a third party to whom the judgment debtor owes money "to have the interest or debt applied to the satisfaction of the money judgment"); *id.* § 708.510(a) (authorizing a court to "order the judgment debtor to assign to the judgment creditor . . . all or part of a right to payment due"). That is precisely the situation in the present case: Bank Melli has a contractual right to obtain payments from Visa and Franklin. Under California law, those assets are property of Bank Melli and may be assigned to judgment creditors.

But even if federal law should govern this question, *see Heiser v. Islamic Republic of Iran*, 735 F.3d 934, 940 (D.C. Cir. 2013) (creating federal rule of decision to interpret ownership requirements in FSIA, based in part on U.C.C. Article 4A and common law principles), Bank Melli would not succeed. Federal law and California law are aligned.

First, we note that Congress has used expansive wording to suggest that immediate and outright ownership of assets is not required. In the TRIA, Congress provided that "[n]othing in this subsection shall bar . . . enforcement of any judgment to which this subsection applies . . . against assets otherwise available under this section *or under any other provision of law*." TRIA § 201(d)(4) (emphasis added). In FSIA § 1610(g), Congress specified that "the property of a foreign state against which a judgment is entered under section 1605A, and *the property of an* agency or *instrumentality* of such a state, *including property that* is a separate juridical entity or *is an interest held directly or indirectly* in a separate juridical entity, is subject to attachment in aid of execution, and execution, upon that judgment as provided in this

section." (Emphases added.) Thus, interests held by the instrumentality of a terrorist state, as is the case here, are subject to attachment under federal law.

Second, in *Heiser*, only foreign nationals, and not a foreign country, had an interest in the blocked funds held by intermediary banks. "Iranian entities were not the originators of the funds transfers. Nor were they the ultimate beneficiaries." *Heiser*, 735 F.3d at 936 (footnote omitted). By contrast, here, Bank Melli *is* the ultimate beneficiary; Visa and Franklin owe money to Bank Melli for services rendered pursuant to an agreement between them. Accordingly, Bank Melli has an interest in the blocked assets.

In summary, California law applies. Under California law, money owed to Bank Melli may be assigned to judgment creditors. Even if federal law applies, under the *Heiser* court's rationale, attachment and execution are allowed here because Bank Melli is the intended contractual beneficiary of the contested funds.

D. *Because Bank Melli does not enjoy sovereign immunity, Rule 19 presents no barrier.*

Finally, Bank Melli relies on Federal Rule of Civil Procedure 19 to support its request for dismissal. That rule provides that a person must be joined as a party if the person "claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may . . . impair or impede the person's ability to protect the interest." Fed. R. Civ. P. 19(a). And, if the "person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the

action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b).

Bank Melli argues that this case must be dismissed because it is a required party that cannot be joined and, further, that the action cannot proceed without it "in equity and good conscience." But, because TRIA § 201(a) and FSIA § 1610(g) confer jurisdiction by creating exceptions to sovereign immunity, Bank Melli *can* be joined in this action. Thus it does not matter whether Bank Melli is otherwise a required party under Rule 19(a); dismissal is not required. *See* 28 U.S.C. § 1330 (providing jurisdiction over a foreign state or its instrumentality when it is not entitled to immunity); *Weinstein*, 609 F.3d at 49–50 (holding that TRIA § 201(a) removes jurisdictional immunity, as well as immunity from attachment and execution).[8]

According to Bank Melli, *Republic of the Philippines v. Pimentel*, 553 U.S. 851 (2008), requires dismissal. We disagree. A class of victims of human rights abuses in the Republic of the Philippines won a $2 billion default judgment against the Estate of Ferdinand Marcos, the former president of that country. *Id.* at 857–58. The class attempted to enforce the judgment by attaching assets owed to Merrill

---

[8] Bank Melli's citations to *Ministry of Defense & Support for Armed Forces of Islamic Republic of Iran v. Cubic Defense Systems, Inc.*, 385 F.3d 1206 (9th Cir. 2004), *vacated and remanded on other grounds sub nom*. *Ministry of Def. & Support for Armed Forces of Islamic Republic of Iran v. Elahi*, 546 U.S. 450 (2006) (per curiam); and *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117 (9th Cir. 2010), are inapposite. Neither of those cases addressed the question whether TRIA § 201(a) or FSIA § 1610(g) confers jurisdiction when property owned by a terrorist state's instrumentality is subject to execution in satisfaction of judgments entered against that terrorist state.

Lynch by a bank incorporated by Marcos personally. *Id.* at 858. The Philippines claimed ownership of the bank, and therefore the disputed assets, because the bank had been incorporated through a misuse of public office. *Id.* The Philippines also claimed immunity from the suit. *Id.* Merrill Lynch initiated an interpleader action naming, among other parties, the Republic of the Philippines and one of its agencies. *Id.* at 845–55. The Supreme Court held that the case should be dismissed because "it was improper [for the district court] to issue a definitive holding regarding a nonfrivolous, substantive claim made by an absent, required entity that was entitled by its sovereign status to immunity from suit." *Id.* at 868.

This case plainly is distinguishable. In *Pimentel*, the Republic was a required party that could not be joined because of sovereign immunity. Here, Bank Melli does not enjoy sovereign immunity, so it can be joined as a party, whether or not it is a required party. Unlike the Republic in *Pimentel*, therefore, Bank Melli is able to adjudicate its claim to the contested assets.

## CONCLUSION

We hold: (1) TRIA § 201(a) and FSIA § 1610(g) authorize attachment and execution of the monies owed to Bank Melli. (2) Those statutes do not impose liability retroactively but, even if they are viewed as doing so, *Altmann* establishes a presumption in favor of retroactivity for statutes governing sovereign immunity, which is not rebutted here. (3) California law governs the ownership question; the blocked assets are property of Bank Melli under principles of California law and, thus, are subject to attachment and execution under TRIA § 201(a) and FSIA

§ 1610(g).  The same result would obtain even if federal law governed.  (4) Because Bank Melli can be joined in this action, the dismissal provision of Federal Rule of Civil Procedure 19 does not apply.

**AFFIRMED.**

BENSON, Senior District Judge, concurring in part and dissenting in part:

I concur with the majority that § 201(a) of the Terrorism Risk Insurance Act ("TRIA") and § 1610 of the Foreign Sovereign Immunities Act ("FSIA") permit the judgment creditors in this case to attach and execute against monies owed to Bank Melli.  However, I respectfully believe the majority erred in finding § 1610(g) to be a freestanding immunity exception under FSIA.  In my view, judgment creditors relying on § 1610(g) are able to proceed, regardless of Bank Melli's sovereign immunity, because the judgment creditors have sufficiently alleged Bank Melli is engaged in commerce in the United States within the meaning of § 1610(b)(3) of FSIA.

FSIA contains "extensive procedural protections for foreign sovereigns in United States courts." *Wyatt v. Syrian Arab Republic*, 800 F.3d 331, 333 (7th Cir. 2015). Specifically, § 1609 of FSIA provides a general presumption that property of a foreign state and the property of an instrumentality or agency of a foreign state is immune from execution and attachment in United States courts. *See* 28 U.S.C. § 1609; 28 U.S.C. § 1603(a).  In turn, § 1610 provides a series of exceptions to this general rule.

Prior to 2008, § 1610 provided different rules for attachment immunity depending on whether the party was seeking immunity as the foreign state or as an agency or instrumentality of a foreign state.  Regarding foreign states, § 1610(a) denied immunity where: (1) a judgment creditor obtained a judgment against the foreign state; (2) the property of the foreign state is located in the United States; (3) the property is used for "a commercial activity" in the United States; and (4) one of § 1610(a)'s seven avenues for abrogating immunity applied.  *See* 28 U.S.C. § 1610(a). Similarly, with respect to agencies and instrumentalities, § 1610(b) denied immunity where: (1) a judgment creditor obtained a judgment against an agency or instrumentality of foreign state; (2) the agency or instrumentality is engaged in commercial activity in the United States; (3) the property of the agency or instrumentality is located in the United States; and (4) one of § 1610(b)'s three avenues for abrogating immunity applied.  *See* 28 U.S.C. § 1610(b).

Prior to 2008, the judgment creditors in this case would have been required to obtain a judgment against Bank Melli to utilize the immunity waiver provisions under § 1610(b) to attach Bank Melli's property.

In 2008, Congress amended FSIA, adding § 1610(g) and § 1605A.  National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338 (2008).  The purpose of the amendments was to relax the protections of § 1610 in cases of state sponsored terrorism to "make it easier for terrorism victims to obtain judgments and to attach assets." *Gates v. Syrian Arab Republic*, 755 F.3d 568, 576 (7th Cir. 2014); *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 62 (D.D.C. 2009) (noting, "these latest additions to . . . FSIA demonstrate that

Congress remains focused on eliminating those barriers that have made it nearly impossible for plaintiffs in these actions to execute civil judgments against Iran or other state sponsors of terrorism").

Under § 1610(g), if a judgment creditor obtains a judgment under § 1605A, the property of the foreign state and "the property of an agency or instrumentality of such a state, including property that is a separate juridical entity . . . is subject to attachment . . . and execution, upon that judgment *as provided in this section*, regardless" of five factors. 28 U.S.C. § 1610(g)(1) (emphasis added). The five factors enumerated in § 1610(g)(A) through (E) reflect the Bancec presumption, which requires this Court to treat government entities established as separate juridical entities distinct from their sovereigns. *See First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611, 620–21 (1983); *Flatow v. Islamic Republic of Iran*, 308 F.3d 1065, 1071 n.9 (9th Cir. 2009) (outlining the Bancec factors (citing *Walter Fuller Aircraft Sales, Inc. v. Republic of the Philippines*, 965 F.2d 1375, 1380 n.7 (5th Cir.1992))).

Section 1610(g) leads to two straightforward conclusions under FSIA. First, if a party obtains a § 1605A judgment against a state sponsor of terror, the Bancec presumption is eliminated, which permits a court to attach and execute against the property of the agency or instrumentality to satisfy the judgments against the foreign state. *See Estate of Heiser v. Islamic Republic of Iran*, 885 F. Supp. 2d 429, 442 (D.D.C. 2012) ("Section § 1610(g) subparagraphs (A)–(E) explicitly prohibit consideration of each of the five Bancec factors."); *aff'd sub nom. Heiser v. Islamic Republic of Iran*, 735 F.3d 934 (D.C. Cir. 2013). Second, the language "as provided in this section" requires a judgment creditor to

find an existing mechanism of attachment under § 1610. Section 1610(g) does not create a new avenue for attachment under FSIA; rather, § 1610(g) broadens the force of § 1610's existing avenues for attachment by eliminating the legal fiction that Bank Melli is a separate juridical entity from Iran.

In this case, judgment creditors relying on § 1610(g) may proceed to attach Bank Melli's property because Bank Melli's property is not immune from attachment by virtue of § 1610(b)(3). Section 1610(b)(3) eliminates attachment immunity if an agency or instrumentality is "engaged in commercial activity in the United States" and "the judgment relates to a claim for which the agency or instrumentality is not immune by virtue of section 1605A of this chapter . . . regardless of whether the property is or was involved in the act upon which the claim is based." 28 U.S.C. § 1610(b)(3). The judgment creditors can attach Bank Melli's property because: (1) the judgment creditors have obtained a judgment against Iran pursuant to § 1605A; (2) § 1610(g) eliminates the Bancec presumption, allowing this Court to attach and execute against Bank Melli's assets to satisfy the judgment against Iran; and (3) the judgment creditors have sufficiently plead that Bank Melli is engaged in commercial activity in the United States.

Section 1603(c) of FSIA defines commercial activity as: "either a regular course of commercial conduct *or* a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(c) (emphasis added). Bank Melli entered into a contract with an American company to provide an American company a commercial service. [ER, p. 82–83, ¶ 2; ER, p. 64, ¶ 16

("Visa holds the Blocked Assets, funds due and owing by contract to Bank Melli pursuant to a commercial relationship with that bank . . .").] At this stage in the litigation, the Court can conclude that the judgment creditors relying on § 1610(g) have sufficiently alleged Bank Melli is engaged in commercial activity in the United States.

The majority disagrees with the aforementioned interpretation and concludes that § 1610(g) creates a freestanding immunity exception under FSIA. The majority believes a § 1605A judgment creditor may attach Bank Melli's property regardless of any commercial component under § 1610(a) or § 1610(b). In my view, respectfully, the majority misses the mark in three important respects.

First, the majority erroneously finds that § 1610(g) is a freestanding exception to immunity by concluding:

> Subsection (g) covers a different subject than § 1610(a) through (e): by its express terms, it applies *only* to 'certain actions,' specifically, judgments 'entered under section 1605A.' (Emphasis added.) In turn, § 1605A revokes sovereign immunity for damages claims against a foreign state for personal injury or death caused by 'torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support' for such an act. By definition, such claims do not arise from commercial activity; they arise from acts of torture (and the like).

[Maj. Op., p. 17.] In doing so, the majority misinterprets the operation of § 1610(a) and (b) waivers in the context of

§ 1605A judgments.  Under § 1610(b)(3), a judgment creditor can attach property where the instrumentality is engaged in commercial activity in the United States.   Furthermore, § 1610(b)(3) provides that attachment immunity is eliminated "*regardless* of whether the property is or was involved with the act upon which the claim is based."   28 U.S.C. § 1610(b)(3) (emphasis added).   Therefore, a § 1605A judgment allows a judgment creditor to get immunity waived for *any* property where the instrumentality is engaged in commerce in the United States, regardless whether the property was involved in the actions that gave rise to the § 1605A waiver of immunity against the foreign state. Therefore, Bank Melli's property does not need to be involved in terrorism to abrogate attachment immunity under § 1610(b)(3).

Second, the majority concludes that the "as provided in this section" language found in § 1610(g) refers to the procedural aspects of § 1610, namely § 1610(f).  Fair enough. But, the majority's conclusion does not mean the language "as provided in this section" refers *only* to § 1610(f).  Indeed, the majority's piecemeal reading of § 1610(g) renders other portions of § 1610 inoperable.  "It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'"  *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)).  This Court should adopt the interpretation of § 1610 that "'gives effect to every clause and word.'"  *Marx v. Gen. Revenue Corp.*, ___U.S.___, 133 S. Ct. 1166, 1177 (2013) (citing *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91 (2011)).

The majority ignores the avenues for exemption under § 1610(a)(7) and § 1610(b)(3). Section 1610(a)(7) and § 1610(b)(3) provide immunity, in addition to requiring some interplay with commerce, where "the judgment relates to a claim for which the foreign state is not immune under section 1605A . . . ." If a § 1605A judgment creditor can waive attachment immunity under § 1610(g) without proving the property is used in commerce or the instrumentality is engaged in commerce in the United States, § 1610(a)(7) and § 1610(b)(3) are rendered superfluous and obsolete. Conversely, recognizing § 1610(g)'s limited purpose was to eliminate the Bancec presumption ensures this Court gives effect to every clause and word in § 1610 while honoring the purpose of the 2008 FSIA amendments.

Finally, the majority's holding ignores the practical limitation the commerce requirement places on § 1605A judgments. Reading § 1610(g) as a freestanding immunity exception does not just relax FSIA in the context of terrorism—it eliminates any immunity protection under FSIA for state sponsors of terror and their instrumentalities. For example, in *Rubin v. Islamic Republic of Iran*, American citizens sued and obtained default judgments against Iran for injuries and losses that arose out of a suicide bombing carried out by Hamas in Israel. 33 F. Supp. 3d 1003, 1006 (N.D. Ill. 2014). The *Rubin* plaintiffs sought to "attach and execute on numerous ancient Persian artifacts" in possession of two museums in the United States to satisfy their default judgments against Iran. *Id.* Like the judgment creditors in this case, the *Rubin* plaintiffs argued that § 1610(g) is a freestanding immunity exception and, therefore, the plaintiffs may attach Iran's artifacts to satisfy their judgments. *Id.* at 1013.

The court disagreed, finding: "The plain language indicates that Section 1610(g) is not a separate basis of attachment, but rather qualifies the previous subsections." *Id.* The court concluded, "the purpose of Section 1610(g) is to counteract the Supreme Court's decision in Bancec, and to allow execution against the assets of separate juridical entities regardless of the protections Bancec may have offered." *Id.* Currently, the *Rubin* case is pending appeal in the Seventh Circuit. *Rubin v. Islamic Republic of Iran*, 33 F. Supp. 3d 1003 (N.D. Ill. 2014), *appeal docketed*, No. 14-1935 (7th Cir. Apr. 25, 2014).

Surely this Court's holding will be argued as precedent to allow the *Rubin* plaintiffs to seize Persian artifacts to be auctioned off to satisfy the *Rubin* plaintiffs' default judgments. This would be an unjustified and unfortunate result. When Congress amended FSIA, the intention was to eliminate the Bancec presumption and relax the rigidity of § 1610 to make it easier for victims of terrorism to satisfy judgments against state sponsors of terror. Congress did not, however, intend to open the floodgates and allow terrorism plaintiffs to attach any and all Iranian property in the United States. Rather, Congress intended the commerce limitation to remain in place.[1] If a foreign state is designated as a state sponsor of terror, the state and the instrumentalities and agencies of the state lose the privilege of doing business in

---

[1] TRIA § 201 similarly contains a limitation on attachment and execution. TRIA § 201 requires attachable assets to be defined as "blocked assets." Section 201(d)(2)(A) defines a "blocked asset" as any asset "seized or frozen by the United States under section 5(b) of the Trading With the Enemy Act (50 U.S.C. App. 5(b)) or under sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701; 1702)."

the United States without running the risk of property being seized to satisfy judgments.

In sum, I would require judgment creditors relying on § 1610(g) to satisfy one of § 1610's existing avenues for abrogating attachment immunity. In this case, the judgment creditors have done that. The judgment creditors have sufficiently alleged Bank Melli is engaged in commerce in the United States within the meaning of § 1610(b)(3).